## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### Case No.: 3:22-cv-206-FDW-DSC

| | |
|---|---|
| **Salsarita's Franchising, LLC**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **Gibson Family Enterprises, LLC**, | ) |
| **Bill E. Gibson**, & | ) |
| **Holli R. Gibson**, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**CONSENT JUDGMENT AND PERMANENT INJUNCTION**

THIS MATTER is before the Court following the filing by the Parties on November 14, 2022 of a Joint Motion for Entry of Consent Judgment and Permanent Injunction (the "Motion"). (Doc. No. 47). In the Motion, and as further set forth in the Parties' supporting joint memorandum of law (Doc. No. 48), Plaintiff Salsarita's Franchising, LLC ("Salsarita's") and Defendants Gibson Family Enterprises, LLC ("GFE"), Bill E. Gibson, and Holli R. Gibson (collectively, the "Gibsons," and together with GFE, the "Defendants") consent to and move this Court for entry of a final judgment and permanent injunction. This Motion represents, and the Court finds, that the Parties have entered into a Settlement Agreement filed with the Motion to resolve this action. This Court finds that the Settlement Agreement and the exhibits thereto, which are attached to this Judgment as Appendix 1, can be made the subject of this Consent Judgment and Permanent Injunction, and the Court hereby approves, adopts, and incorporates by reference herein the terms of the Settlement Agreement and exhibits thereto, thereby making the Parties' agreement a part of this Judgment.

1

## FINDINGS OF FACT

1.      On or around April 10, 2013, Salsarita's and Defendants executed a Franchise Agreement and related documents for the operation of a Salsarita's® franchised restaurant at 2380 Norman Lane, Lexington, KY 40503.

2.      Defendants Bill E. Gibson and Holli R. Gibson own an interest in and participate in the operation of two restaurants operating under the name, "Burnaco's," in Lexington, Kentucky and Paris, Kentucky, both of which sell Mexican food and beverages.

3.      The Burnaco's in Lexington, Kentucky is within three miles of Defendants' franchised Salsarita's restaurant.

4.      The Burnaco's in Paris, Kentucky is outside a three-mile radius of Defendants' franchised Salsarita's restaurant.

5.      On or around May 9, 2022, Salsarita's sent notice to Defendants that it had terminated the Franchise Agreement.

6.      Defendants disputed the validity of the termination of the Franchise Agreement and continued to operate the Lexington Salsarita's.

7.      Salsarita's alleges, and Defendants dispute, that Defendants are using Salsarita's confidential information and trade secrets to operate Burnaco's in Lexington and Paris.

8.      Defendants have also asserted counterclaims against Salsarita's for breach of the Franchise Agreement due to improper termination of the Agreement as well as claims for unfair and deceptive trade practices.

9.      Salsarita's denies the allegations made by the Defendants in connection with these claims.

10.     On November 14, 2022, the Parties entered into a Settlement Agreement to resolve all disputes among them.

2

11.     Pursuant to Paragraph 2 of the Settlement Agreement, the Parties agreed that the Franchise Agreement would be terminated effective December 5, 2022.

## CONCLUSIONS OF LAW

1.     This Court has personal jurisdiction over all Parties pursuant to the Parties' forum selection clause.

2.     This Court has subject matter jurisdiction over this dispute pursuant to principles of federal question jurisdiction and supplemental jurisdiction.

3.     Salsarita's presented evidence that it argues supports its claims for breach of contract, trademark infringement, unfair competition and false advertising, misappropriation of trade secrets, and unfair and deceptive trade practices. Defendants deny Salsarita's evidence supports those claims and contend that the evidence supports their claims for breach of contract and unfair and deceptive trade practices.

4.     The provisions of the Settlement Agreement represent a compromise that grants the relief awarded in this Consent Judgment and Permanent Injunction to Salsarita's.

5.     Salsarita's asserts that it has an inadequate remedy at law and will suffer irreparable harm without an injunction, that the balance of the harms weighs in favor of the injunctive relief awarded in this Order, and that the public interests favor entry of this Order. While the Defendants dispute these allegations, they are agreeable to the terms of this Consent Judgment and Permanent Injunction as part of settlement of the disputes between the parties.

6.     Entry of this Consent Judgment and Permanent Injunction fully and finally resolves all claims and defenses asserted in this litigation, except for any proceeding to enforce the terms of this Order and except for any claims made pursuant to Paragraph 13 of the Settlement Agreement, which will be decided outside this litigation.

7.     This Consent Judgment and Permanent Injunction is binding and enforceable both as to form and scope pursuant to Federal Rule of Civil Procedure 65(d).

8.     The Settlement Agreement and all of its exhibits, with the exception of Exhibit E,[1] are attached as Appendix 1 to this Order and are made part of this Order. All capitalized terms not otherwise defined in this Order shall have the meaning given to those terms in the Settlement Agreement.

9.     The Parties stipulate to entry of this Consent Judgment and Permanent Injunction.

10.     By stipulating to entry of this Consent Judgment and Permanent Injunction, Defendants do not admit any of the allegations set forth in the Amended Complaint, other than that this Court has personal jurisdictional and subject matter jurisdiction to enter this Order.

11.     The Parties have all waived any right to appeal this Consent Judgment and Permanent Injunction.

12.     The Parties understand the undertakings, obligations, and terms of this Consent Judgment and Permanent Injunction.

13.     The Parties acknowledge they have knowingly and voluntarily agreed to the entry of this Consent Judgment and Permanent Injunction after reviewing the same with their counsel and having had ample opportunity to consult with counsel.

## ORDER

Accordingly, by agreement and consent of the Parties, their Joint Motion for Entry of Consent Judgment and Permanent Injunction, (Doc. No. 47), is GRANTED. It is hereby ORDERED, ADJUDGED, and DECREED, and Defendants are PERMANENTLY ENJOINED, as follows:

---

[1] Exhibit E, which contains confidential and proprietary information, as well as trade secrets, has been filed under permanent seal with the Court.  (Doc. No. 49).  The redaction appears in this Order.

4

14.     By December 5, 2022, Defendants must permanently cease to operate the Lexington Salsarita's and shall permanently cease to use the Salsarita's System or the Salsarita's Proprietary marks. Until that time, Defendants shall strictly comply with the requirements of the Franchise Agreement. Thereafter, Defendants shall not represent themselves to the public or hold themselves out as present or former Salsarita's franchisees.

15.     By December 5, 2022, Defendants must make all necessary modifications or alterations to the premises of the Lexington Salsarita's to distinguish the appearance of the premises from that of any other Salsarita's® restaurant. Specifically, Defendants shall complete the requirements for de-identification set forth in the De-Identification Checklist attached to the Settlement Agreement as Exhibit B. Defendants must permit Salsarita's to inspect the Lexington Salsarita's premises to determine compliance with the De-Identification Checklist in accordance with the timeline set forth in Paragraph 4 of the Settlement Agreement.

16.     For the two-year period beginning November 14, 2022, and except as otherwise permitted by Paragraph 14 of this Order, Defendants shall not, by themselves or through or in conjunction with any other person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in any restaurant that sells Tex-Mex or Mexican food or beverages. This restriction shall apply to the following geographic areas: (a) at the Lexington Salsarita's premises; (b) within a three-mile radius from the Lexington Salsarita's premises; or (c) within a two-mile radius of any other Salsarita's franchisee currently in operation as of the Effective Date. For example, and without limitation, this restriction prohibits Defendants from providing Mexican food or beverage catering services within the restricted geographic areas, but not outside the restricted geographic areas. For another example, and without limitation, this restriction prohibits Defendants from operating a Mexican food or beverage food truck within the

5

restricted geographic areas, but not outside the restricted geographic areas. This restriction does not prohibit Defendants from owning less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

17.     On or before December 5, 2022, Defendants shall cause the Lexington Burnaco's to modify its menu in accordance with Paragraph 6 of the Settlement Agreement. Defendants' obligations under this Paragraph shall expire November 14, 2024.

18.     Effective November 14, 2022, Defendants shall not publish, disclose, transfer, release, divulge, or use any of Salsarita's Confidential Information or Trade Secrets, including without limitation for the benefit of any other enterprise such as the Lexington Burnaco's or the Paris Burnaco's as provided in the parties' now terminated Franchise Agreement. This restriction does not prohibit Defendants from using Salsarita's Confidential Information and Trade Secrets for the operation of the Lexington Salsarita's through December 5, 2022, as permitted in Paragraph 14 of this Order. On or before December 5, 2022, Defendants shall return to Salsarita's and shall not retain any copies of all Confidential Information and Trade Secrets in their custody or control, whether in electronic, hard copy, or any other form.

19.     Effective November 14, 2022, Defendants shall ensure the Paris Burnaco's is not using any of Salsarita's Confidential Information or Trade Secrets. Effective December 5, 2022, Defendants shall cause the Paris Burnaco's to modify its menu and undertake the obligations set forth in Paragraph 8 of the Settlement Agreement.

20.     Effective November 14, 2022, and except as otherwise permitted by Paragraph 14 of this Order, Defendants shall permanently cease all use of the Proprietary Marks and any other marks confusingly similar thereto and shall not identify themselves or their businesses in any way that suggests a connection or associate with, or an endorsement or sponsorship by, Salsarita's. On

or before December 5, 2022, Defendants shall deliver to Salsarita's all materials bearing the Proprietary Marks, whether in electronic, hard copy, or other form.

21.     Defendants must abide by all provisions of the Franchise Agreement (attached to the Settlement Agreement as Exhibit A) that, by their terms, extend beyond termination. These provisions of the Franchise Agreement, which will remain in full force and effect, include: Section IX.A.1.; Section XI.A.; Section XI.F.; Section XII.A.; Section XII.B.; Section XII.C.; Section XVI.B. through I.; Section XVII.B.; Section XVIII.; Section XXII. (except subsections G and M).; and all applicable provisions of the Payment and Performance Guarantee.

22.     Defendants must otherwise strictly comply with the Settlement Agreement in all respects.

23.     This Consent Judgment and Permanent Injunction is binding upon Defendants, together with their respective officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with any of them who receive actual notice in any manner of this Consent Judgment and Permanent Injunction by personal service or otherwise.

24.     This Consent Judgment and Permanent Injunction coupled with the Settlement Agreement  is a full and final resolution of all claims that were asserted or that could have been asserted by the Parties in this action, including damages, except for any claims made pursuant to Paragraph 13 of the Settlement Agreement, which will be decided outside this litigation, and subject to the following provision: This Court shall retain jurisdiction to enforce the terms of this Consent Judgment and Permanent Injunction and the Settlement Agreement. Should the Court find, upon motion filed by an aggrieved party, that there has been a violation of the Consent Judgment and Permanent Injunction or Settlement Agreement, the Court is empowered to

7

determine the appropriate remedy for said violation, including, if the Court deems appropriate, invocation of the Court's power of contempt.

25.    The Court retains jurisdiction over any motion or action to enforce this Consent Judgment and Permanent Injunction or the Settlement Agreement. Otherwise, this Consent Judgment resolves this action and is a final judgment. Each party hereto shall bear his or its own costs and attorneys' fees incurred to date.

26.    The Clerk is respectfully directed to CLOSE THE CASE and TERMINATE all pending motions.

IT IS SO ORDERED.

Signed: November 17, 2022

Frank D. Whitney
United States District Judge

CONSENTED TO:

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ Matthew S. DeAntonio*
Matthew S. DeAntonio (N.C. Bar No. 39625)
Samuel M. Dearstyne (N.C. Bar No. 54803)
mdeantonio@bradley.com
sdearstyne@bradley.com
214 North Tryon Street, Suite 3700
Charlotte, NC  28202/
Telephone: (704) 338-6000
Fax: (704) 332-8858
*Attorneys for Plaintiff*
*Salsarita's Franchising, LLC*

**DINSMORE & SHOHL LLP**

*/s/ Grahmn N. Morgan (with permission)*
Grahmn N. Morgan (admitted pro hac vice)
Kristeena L. Johnson (admitted pro hac vice)
100 W. Main Street, Ste. 900
Lexington, Kentucky 40507
T: (859) 425-1000
F: (859) 425-1099
Grahmn.morgan@dinsmore.com
Kristeena.johnson@dinsmore.com
*Attorneys for Defendants*

AND

**MILLBERG GORDON STEWART PLLC**

*/s/ Peter N. Borden (with permission)*
Peter N. Borden (N.C. Bar No. 53389)
1101 Haynes St., Ste. 104
Raleigh, North Carolina 27604
T: (919) 836-0090
F: (919) 836-8027
pborden@mgsattorneys.com
*Attorney for Defendants*

9

# APPENDIX 1

# SETTLEMENT AGREEMENT

## PREAMBLE

This Confidential Settlement Agreement ("**Settlement Agreement**") is entered into by and between Salsarita's Franchising, LLC ("**Salsarita's**"), on the one hand, and Gibson Family Enterprises, LLC ("**GFE**"), Bill E. Gibson, and Holli R. Gibson (collectively, "**Defendants**"), on the other hand. Salsarita's, GFE, Bill E. Gibson, and Holli R. Gibson may each be referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.     **WHEREAS**, on or around April 10, 2013, Salsarita's and Defendants executed a Franchise Agreement and related documents (collectively, the "**Franchise Agreement**," which is attached and incorporated by reference in this Settlement Agreement as <u>Exhibit A</u>) for the operation of a Salsarita's® franchised restaurant at 2380 Norman Lane, Lexington, KY 40503;[1]

B.     **WHEREAS**, on or around May 9, 2022, Salsarita's sent notice to Defendants that it had terminated the Franchise Agreement;

C.     **WHEREAS**, on or around May 9, 2022, Salsarita's initiated a lawsuit by filing a complaint against Defendants in the United States District Court for the Western District of North Carolina, captioned *Salsarita's Franchising, LLC v. Gibson Family Enterprises, LLC et al.*, Case No. 3:22-cv-206 (the "**Lawsuit**"), asserting claims for breach of contract, trademark infringement, unfair competition and false advertising, misappropriation of trade secrets, and unfair and deceptive trade practices;

D.     **WHEREAS**, on or around September 2, 2022, Salsarita's filed a Motion for Preliminary Injunction seeking, among other things, to enforce certain post-termination obligations in the Franchise Agreement;

E.     **WHEREAS**, on or about September 16, 2022, Defendants filed a Response in Opposition to Salsarita's Motion for Preliminary Injunction, contending that Salsarita's was not entitled to the relief requested in the Motion;

F.     **WHEREAS**, on or around October 3, 2022, Defendants filed an answer to Salsarita's complaint, in which among other things Defendants denied that Salsarita's had properly terminated the Franchise Agreement and denied that Salsarita's was entitled to any of the relief Salsarita's sought;

G.     **WHEREAS**, also on October 3, 2022, Defendants alleged counterclaims against Salsarita's, asserting claims for breach of contract and unfair and deceptive trade practices;

---

[1] An addendum to the Franchise Agreement incorrectly identifies the location as "2830 Norman Lane."

1

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

H. **WHEREAS**, on or around October 24, 2022, Salsarita's filed an answer to Defendants' counterclaims, in which among other things Salsarita's denied Defendants were entitled to any of the relief Defendants sought;

I. **WHEREAS**, without any admissions as to any facts, allegations, liability, or lack thereof, the Parties desire to amicably resolve all differences between them pursuant to the terms and conditions set forth in this Settlement Agreement;

J. **NOW THEREFORE**, in consideration of the promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Definitions.**

The following definitions shall apply in this Settlement Agreement.

(a) "**Advertising Obligation**" has the meaning given to that term in Section VIII.C of the Franchise Agreement.

(b) "**Closing Date**" means twenty-one (21) days after the Effective Date.

(c) "**Confidential Information**" has the meaning given to that term in Section XII.A of the Franchise Agreement. Confidential Information includes, but is not limited to, the Manual, the contents of Salsarita's franchisee portal, training aids, recipes, build guides, or any other documents or information that sets forth the method of operation for a Salsarita's® restaurant.

(d) "**Defendants**" is defined in the Preamble.

(e) "**Effective Date**" is the date on which all Parties have signed this Settlement Agreement.

(f) "**Franchise Agreement**" is defined in Recital A.

(g) "**GFE**" is defined in the Preamble.

(h) "**GFE Parties**" means GFE and its predecessors, successors, affiliates, subsidiaries, assigns, officers, directors, owners, partners, employees, administrators, trustees, insurers, agents, and all other parties who may bring claims on behalf of GFE or be liable for GFE's conduct.

(i) "**Gibson Parties**" means Bill E. Gibson, Holli R. Gibson, their heirs, assigns, executors, administrators, trustees, legal representatives, insurers, agents, and all other parties who may bring claims on behalf of them or be liable for their conduct.

(j) "**Lawsuit**" is defined in Recital C.

2

(k)    **"Lexington Burnaco's"** means the restaurant currently operating under the name "Burnaco's ft. Maiden City Brewing Co." located at 561 S Broadway Unit 110, Lexington KY 40513.

(l)    **"Lexington Salsarita's"** means the franchised Salsarita's® restaurant located at 2380 Norman Lane, Lexington, KY 40503 that Defendants operated pursuant to the Franchise Agreement.

(m)    **"Manual"** has the meaning given to that term in Section X.Q of the Franchise Agreement.

(n)    **"Net Revenues"** has the meaning given to that term in Section VII.D of the Franchise Agreement.

(o)    **"Paris Burnaco's"** means the restaurant operating under the name "Burnaco's" located at 202 Commerce Park Drive, Paris, Kentucky 40361.

(p)    **"Party"** and **"Parties"** are defined in the Preamble.

(q)    **"Proprietary Marks"** has the meaning given to that term in the Recitals of the Franchise Agreement.

(r)    **"Royalty Fees"** has the meaning given to that term in Section VII.B.1 of the Franchise Agreement.

(s)    **"Salsarita's"** is defined in the Preamble.

(t)    **"Salsarita's Parties"** means Salsarita's and its predecessors, successors, affiliates, subsidiaries, assigns, officers, directors, owners, partners, employees, administrators, trustees, insurers, agents, and all other parties who may bring claims on behalf of Salsarita's or be liable for Salsarita's conduct.

(u)    **"Settlement Agreement"** is defined in the Preamble.

(v)    **"System"** has the meaning given to that term in the recitals of the Franchise Agreement.

(w)    **"Trade Secrets"** has the meaning given to that term in Section XII.A of the Franchise Agreement. Trade Secrets include, but are not limited to, the Manual, the contents of Salsarita's franchisee portal, training aids, recipes, build guides, or any other documents or information that sets forth the method of operation for a Salsarita's® restaurant.

2.    **Termination of the Franchise Agreement.**

The Parties agree that the Franchise Agreement is terminated. This termination shall be effective on the Closing Date. Until then, and unless otherwise set forth in this Settlement Agreement, the Parties shall comply with all obligations under the Franchise Agreement, including

3

13

without limitation Defendants' obligation to pay Royalty Fees and Advertising Obligation contributions based on Net Revenues earned through the Closing Date.

### 3. Cease Operating Restaurant.

On or before the Closing Date, Defendants will permanently cease to operate the Lexington Salsarita's as a Salsarita's® franchised restaurant and shall permanently cease to use the Salsarita's System or the Salsarita's Proprietary Marks. Thereafter, Defendants will not represent themselves to the public or hold themselves out as a present or former Salsarita's franchisee.

### 4. De-Identification of the Lexington Salsarita's.

On or before the Closing Date, make all necessary modifications or alterations to the premises of the Lexington Salsarita's to distinguish the appearance of the premises from that of any other Salsarita's® restaurant. Specifically, Defendants shall complete the requirements for de-identification set forth in the De-Identification Checklist attached as Exhibit B, which is incorporated by reference herein.

Defendants will permit Salsarita's to inspect the Salsarita's Lexington premises to determine compliance with the De-Identification Checklist. Salsarita's may schedule the inspection by giving Defendants seven (7) calendar days' notice of its intent to conduct the inspection and any such inspection shall take place within forty (40) days of the Closing Date. Unless otherwise agreed by the parties, the inspection will occur no earlier than the Closing Date. Unless otherwise agreed by the parties, the inspection shall occur during normal business hours. Defendants shall use reasonable, diligent and good faith efforts to secure cooperation from the landlord for the Lexington Salsarita's premises, to the extent such cooperation is necessary or helpful for Salsarita's to conduct the inspection. Defendants' obligation to permit an inspection shall apply only so long as the Defendants or any affiliated entity holds a lease on the premises; however, Defendants represent and warrant that they have no current plan or intention to terminate or end their lease on the premises such that Salsarita's would be prevented from conducting this inspection within the 40-day period following the Closing Date.

### 5. Non-Competition.

For the two-year period beginning on the Effective Date, Defendants shall not (except as otherwise permitted pursuant to Paragraph 3 above), by themselves or through or in conjunction with any other person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in any restaurant that sells Tex-Mex or Mexican food or beverages.

This restriction shall apply to the following geographic areas: (a) at the Lexington Salsarita's premises; (b) within a three-mile radius from the Lexington Salsarita's premises; or (c) within a two-mile radius of any other Salsarita's franchisee currently in operation as of the Effective Date.

4

For example, and without limitation, this restriction prohibits Defendants from providing Mexican food or beverage catering services within the restricted geographic areas, but not outside the restricted geographic areas.

For another example, and without limitation, this restriction prohibits Defendants from operating a Mexican food or beverage food truck within the restricted geographic areas, but not outside the restricted geographic areas.

The restriction in this Paragraph does not prohibit Defendants from owning less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

6. **Modification of Lexington Burnaco's Menu and Menu Offerings.**

On or before the Closing Date, Defendants shall cause the Lexington Burnaco's to modify its menu such that it will be substantially different than Salsarita's menu. Specifically:

(a) Defendants shall ensure the Lexington Burnaco's does not prepare any of its offerings using Salsarita's recipes, Confidential Information, or Trade Secrets;

(b) Defendants shall ensure the Lexington Burnaco's does not describe its offerings as similar to or in any way associated with Salsarita's offerings;

(c) Defendants shall ensure the Lexington Burnaco's removes from its menu, and ceases to serve, the crossed-out items on the menu attached as Exhibit C; and

(d) Defendants shall ensure the Lexington Burnaco's, whether for dine-in, to-go, or catering service, does not offer any Tex-Mex or Mexican food or beverages, including tacos (soft-shell, hard-shell, or bowls), burritos (in tortillas or in a bowl), quesadillas, Tex-Mex or Mexican salads, or salsas that are substantially similar to Salsarita's salsas; provided, however, that the Lexington Burnaco's may sell nachos, salsa, and alcoholic beverages so long as any such nachos, salsas, and alcoholic beverages are not prepared using any of Salsarita's recipes, Confidential Information, or Trade Secrets.

So long as Defendants comply with this Paragraph, Defendants' involvement in the Lexington Burnaco's shall not violate Paragraph 5 above.

Defendants represent and warrant that they, at present, have the authority and ability to ensure the Lexington Burnaco's takes the actions anticipated by this Paragraph, and they have no current plan or intention to lose this authority and ability.

Defendants' obligations under subsections (c) and (d) of this Paragraph, as well as any prohibitions on the use of Confidential Information, shall expire two (2) years after the Effective Date. To the extent the Defendants cease to hold any interest in the Lexington Burnaco's prior to the expiration of two (2) years, Defendants' obligations under this Paragraph shall cease at the time that the Defendants cease to hold any interest; however, Defendants represent and warrant

5

that they have no current plan or intention to cease to hold their interest in the Lexington Burnaco's prior to complying with subsections (a)–(d) above.

7. **Return and Non-Use of Confidential Information and Trade Secrets.**

Defendants shall not publish, disclose, transfer, release, divulge, or use any of Salsarita's Confidential Information or Trade Secrets, including without limitation for the benefit of any other enterprise such as the Lexington Burnaco's or the Paris Burnaco's as provided in the Franchise Agreement.

On or before the Closing Date, Defendants shall return to Salsarita's and shall not retain any copies of all Confidential Information and Trade Secrets in their custody or control, whether in electronic, hard copy, or any other form.

This restriction in this Paragraph does not prohibit Defendants from using Salsarita's Confidential Information and Trade Secrets for the operation of the Lexington Salsarita's until the Closing Date, as permitted in Paragraph 3 above.

8. **Modification of Paris Burnaco's Menu and Menu Offerings.**

As of the Effective Date, Defendants shall ensure the Paris Burnaco's is not using any of Salsarita's Confidential Information or Trade Secrets. Furthermore, on or before the Closing Date, Defendants will cause the Paris Burnaco's to undertake the following:

(a) Defendants shall ensure the Paris Burnaco's does not prepare any of its offerings using Salsarita's recipes, Confidential Information, or Trade Secrets;

(b) Defendants shall ensure the Paris Burnaco's does not describe its offerings as similar to or in any way associated with or similar to Salsarita's menu items. So long as the Paris Burnaco's makes the alterations to its menu set forth in subparagraphs (c) through (f) below, Salsarita's represents that is not currently aware of any conduct that would constitute a violation of this subsection;

(c) Defendants shall ensure the Paris Burnaco's modifies its menu in accordance with the revised menu attached as Exhibit D; provided, however, that Defendants may allow the Paris Burnaco's to modify its menu and add or remove items as it sees fit, so long as Defendants comply with the other provisions of this Settlement Agreement;

(d) Defendants will cause the Paris Burnaco's to remove from its menu, and forever cease to sell, a "Smothered Burrito." This restriction does not prohibit Defendants from allowing the Paris Burnaco's to sell a burrito, with the option of adding queso for an additional charge, so long as Defendants ensure the Paris Burnaco's does not advertise, market, or otherwise present such an item as a featured item or otherwise market such an offering similar to how Salsarita's

6

markets its featured burrito smothered with queso (e.g., through use of the term "quesorito" or "smothered");

(e) Defendants will cause the Paris Burnaco's to modify its "Family Take Home Meal," such that it is not substantially similar to the Salsarita's "Fiesta Pack." This restriction does not prohibit Defendants from allowing the Paris Burnaco's to sell à la carte to-go items in bulk. Furthermore, for a period of two years starting from the Effective Date, Defendants will ensure that the Paris Burnaco's does not sell as a single item a take-home, build-you-own taco or burrito family meal;

(f) Defendants will ensure the Paris Burnaco's does not offer a salsa menu that is substantially similar to the Salsarita's salsa menu. Specifically, Defendants will cause the Paris Burnaco's to describe its salsa offerings as set forth on Exhibit D. Defendants represent and warrant that the salsa recipes currently in use at the Paris Burnaco's are set forth in the attached Exhibit E. The Parties agree that so long as Defendants cause Burnaco's to describe its salsa offerings as set forth in Exhibit D, using the recipes set forth in Exhibit E, Defendants shall not be in violation of this subsection. Defendants may allow the Paris Burnaco's to modify its salsa offerings, so long as Defendants ensure the Paris Burnaco's does not prepare any of its offerings using Salsarita's recipes, Confidential Information, or Trade Secrets.

Defendants represent and warrant that they, at present, have the authority and ability to ensure the Paris Burnaco's takes the actions anticipated by this Paragraph, and they have no current plan or intention to lose this authority and ability prior to complying with subsections (a)–(f) above.

Defendants' obligations under this Paragraph shall cease to exist at any point that the Defendants no longer hold an interest in the Paris Burnaco's; however, Defendants represent and warrant that they have no current plan or intention to cease to hold an interest in the Paris Burnaco's prior to complying with subsections (a)–(f) above.

In any event, any obligations under this Paragraph restricting the use of Confidential Information shall expire two years from the Effective Date. Any obligations under this Paragraph restricting the use of Trade Secrets shall expire only when the information at issue ceases to be a trade secret under relevant law.

9.   **Cease Use of Salsarita's Proprietary Marks.**

Beginning on the Effective Date, and except as otherwise permitted by Paragraph 3 above, Defendants shall permanently cease all use of the Proprietary Marks and any other marks confusingly similar thereto and shall not identify themselves or their businesses in any way that suggests a connection or associate with, or an endorsement or sponsorship by, Salsarita's.

On or before the Closing Date, Defendants shall deliver to Salsarita's all materials bearing the Proprietary Marks, whether in electronic, hard copy, or other form.

7

10. **Compliance with All Other Post-Termination Obligations.**

Notwithstanding the termination of the Franchise Agreement set forth in Paragraph 2 above, unless otherwise agreed in this Settlement Agreement, the Parties shall comply with by all provisions of the Franchise Agreement which, by their terms, extend beyond termination including without limitation Section IX.A.1; Section XI.A; Section XI.F; Section XII.A; Section XII.B; Section XII.C; Section XVI.B through I; Section XVII.B; Section XVIII; Section XXII (except subsections G and M); and all applicable provisions of the Payment and Performance Guarantee.

11. **Consent Judgment and Permanent Injunction.**

The Parties agree to jointly move the Court for entry of a consent judgment and permanent injunction, attached as Exhibit F, memorializing the Parties' continuing obligations of this Settlement Agreement. The parties consent to the continuing jurisdiction of the Western District of North Carolina for purposes of enforcing the Consent Judgment and Permanent Injunction. So long as the Court enters a consent judgment and permanent injunction substantially in the form contained within the attached Exhibit F, the parties waive any right to appeal entry of that consent judgment and permanent injunction.

12. **Representations and Warranties.**

Defendants represent and warrant as follows:

(a) They have returned and no longer have in their possession, custody, or control any Confidential Information or Trade Secrets.

(b) They have returned and no longer have in their possession, custody, or control any paper or electronic versions of the Manual, the contents of Salsarita's franchisee portal, recipes, build guides, or any other documents or information that sets forth the method of operation for a Salsarita's restaurant.

(c) That the salsa recipes attached as Exhibit E are in fact the recipes of the only salsas served at the Paris Burnaco's.

13. **Covenant Not to Sue.**

The Parties acknowledge that in the Lawsuit, Salsarita's alleges Defendants underpaid Royalty Fees and Advertising Obligation contributions due and owing to Salsarita's under Section VII of the Franchise Agreement.

Except for the Royalty Fees and Advertising Obligation contributions due and owing under Paragraph 2 above, so long as Defendants comply with this Settlement Agreement, Salsarita's covenants not to sue Defendants to recover the amount of those alleged unpaid Royalty Fees and Advertising Obligation contributions.

However, if (i) Defendants breach this Settlement Agreement, as determined by a final and non-appealable judgment in an action to enforce the terms of this Settlement Agreement, or (ii) a

8

18

court of law through a final order, no longer subject to further appeal, holds Defendants in contempt of the Consent Judgment and Permanent Injunction contemplated in Paragraph 11 above, then:

(a) Salsarita's will no longer be bound by this Covenant Not to Sue;

(b) The statute of limitations, statute of repose, or any other time bar for any claim for recovery of underpaid Royalty Fees and Advertising Obligation contributions shall be deemed to be tolled from the Effective Date to the date on which a court of law issues any such final judgment or final order finding of contempt; and

(c) Defendants agree to submit to an audit of their sales and financial records by an independent forensic accountant of Salsarita's choosing, who shall fully and finally determine whether, and by how much, Defendants underpaid their Royalty Fees and Advertising Obligation contributions during the term of the Franchise Agreement. If the independent forensic account determines there was any underpayment, Defendants shall pay the underpaid Royalty Fees and Advertising Obligation contributions as well as the costs and fees associated with such audit.

14. **Releases.**

The Parties agree to the following releases:

(a) **Release by Defendants.** With the exception of the right to enforce this Settlement Agreement, the GFE Parties and the Gibson Parties release and forever discharge the Salsarita's Parties from any and all claims, actions, suits, demands, liabilities, obligations, damages, costs, and attorney fees, of whatever kind or nature, whether known or unknown, that the GFE Parties or Gibson Parties have against the Salsarita's Parties as of the Effective Date arising out or relating to the facts and circumstances at issue in the Lawsuit or that could have been asserted in the Lawsuit.

(b) **Release by Salsarita's.** With the exception of the right to enforce this Settlement Agreement or to bring an action for enforcement or contempt of the Consent Judgment and Permanent Injunction contemplated in Paragraph 11 above, the Salsarita's Parties release and forever discharge the GFE Parties and Gibson Parties from any and all claims, actions, suits, demands, liabilities, obligations, damages, costs, and attorney fees, of whatever kind or nature, whether known or unknown, that the Salsarita's Parties have against the GFE Parties or Gibson Parties as of the Effective Date arising out or relating to the facts and circumstances at issue in the Lawsuit or that could have been asserted in the Lawsuit. Notwithstanding the foregoing, Salsarita's right to pursue recovery of alleged underpaid Royalty Fees and Advertising Obligation contributions pursuant to Paragraph 13 above are not released.

9

15. **Cooperation and Further Assurances.**

The Parties agree to cooperate in good faith and take all actions reasonably necessary to effectuate the intent of this Settlement Agreement.

16. **Notice and Cure.**

All notices required or permitted under this Settlement Agreement will be in writing, will reference this Settlement Agreement, and will be sent by email and overnight delivery. Such notices will deemed given when received either through email or overnight delivery. All communications will be sent to the Parties as set forth below, and the addresses may be amended by written notice to the other Party from time to time:

| To GFE, Bill E. Gibson, and Holli R. Gibson: | To Salsarita's: |
|---|---|
| Bill Gibson | Tim Carter |
| Holli Gibson | (tcarter@salsarita's.com) |
| (for both: Hollih@bellsouth.net) | Chief Administrative Officer |
| 2126 Wyndamere Lane | Salsarita's Franchising, LLC |
| Paris, KY 40361 | 4601 Charlotte Park Dr., Suite 250 |
| | Charlotte, NC28217 |
| | |
| <u>With a copy to</u>: | <u>With a copy to</u>: |
| Grahmn N. Morgan | Matthew DeAntonio |
| (Grahmn.morgan@dinsmore.com) | (mdeantonio@bradley.com) |
| Kristeena L. Johnson | Samuel Dearstyne |
| (Kristeena.johnson@dinsmore.com) | (sdearstyne@bradley.com) |
| DINSMORE & SHOHL LLP | Bradley Arant Boult Cummings, LLP |
| 100 W. Main Street, Ste. 900 | 214 N. Tryon St., Suite 3700 |
| Lexington, Kentucky 40507 | Charlotte, NC  28202 |

Any party claiming breach of any provision of this Settlement Agreement shall provide written Notice thereof, including a description of the alleged breach sufficiently detailed to allow the opposing party to effectuate a cure. The party alleged to be in breach shall thereafter have ten (10) business days in which to cure any alleged breach.

17. **Joint Negotiation.**

The Parties have participated jointly in the negotiations and drafting of this Settlement Agreement. If an ambiguity or question of intent or interpretation arises, this Settlement Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Settlement Agreement.

10

18. **No Admission.**

This Settlement Agreement does not constitute an admission by any Party of any liability, violation of law or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party, but rather represents a compromise in settlement of disputed claims, liability for which is expressly denied.

19. **Governing Law, Jurisdiction, and Venue.**

This Settlement Agreement will be governed by and construed in accordance with the laws of the State of North Carolina, without regard to its conflict of laws principles. The Parties agree that any action based on the enforcement of the terms and conditions of this Settlement Agreement shall be filed and maintained in Charlotte, North Carolina in the United States District Court for the Western District of North Carolina or the Mecklenburg County Superior Court. The Parties consent to the sole and exclusive jurisdiction of such courts and the exercise of personal jurisdiction therein, and they hereby waive any objections to jurisdiction and venue in such courts.

20. **Enforcement-Related Attorneys' Fees.**

In any action to enforce the terms of the Settlement Agreement, the prevailing party shall be entitled to recover its reasonable costs and attorneys' fees.

21. **Settlement-Related Attorneys' Fees:**

Each Party shall bear its own attorneys' fees incurred in the Lawsuit and associated with the negotiation and preparation of this Settlement Agreement.

22. **Parties' Acknowledgements.**

The Parties represent, warrant and covenant to each other as follows: (a) the Parties have taken all necessary action to authorize their execution, delivery and performance of this Settlement Agreement; (b) the Parties have the authority to execute, deliver and perform their obligations under this Settlement Agreement; (c) the enforceability of this Settlement Agreement is not affected by the provisions of any other agreement to which any of the Parties are a party; (d) there are no actions, suits, or proceedings pending against the Parties in any court or by or before any governmental agency or instrumentality which would materially affect the ability of the Parties to carry out the transactions contemplated by this Settlement Agreement; and (e) the persons executing this Settlement Agreement on behalf of each Party are duly authorized to execute this Settlement Agreement on behalf of the Party and have the power to bind their respective Parties.

23. **Entire Agreement.**

The Parties acknowledge that they have carefully read this Settlement Agreement and know its contents. The Parties further acknowledge that their execution of this Settlement Agreement is a voluntary act. This Settlement Agreement represents the entire and integrated agreement between the Parties and may not be amended except by written instrument signed by all Parties.

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

24. **Binding Effect.**

This Settlement Agreement shall be binding on the Parties and their predecessors, successors, assigns, agents, and affiliates in the future.

25. **Execution.**

This Settlement Agreement may be executed in counterparts and such counterparts together shall constitute a single instrument. The Parties may execute this Settlement Agreement via electronic signature. Delivery of an executed counterpart of this Settlement Agreement by electronic means shall be equally effective as delivery by physical means.

26. **Recitals.**

The above Recitals are made a part of this Settlement Agreement.

27. **Headings.**

Headings used in this Settlement Agreement are intended solely for the convenience of the Parties and shall not affect the interpretation or construction of any provision of this Settlement Agreement.

12

22

**IN WITNESS THEREOF**, the Parties hereto have caused this Settlement Agreement to be executed by their authorized representatives:

**GIBSON FAMILY ENTERPRISES, LLC**          **SALSARITA'S FRANCHISING, LLC**

Bill E. Gibson

By: _____                          By: Philip Friedman, CEO

Date: 11/14/2022 | 11:39 AM CST                    Date: 11/14/2022

**BILL E. GIBSON**

Date: 11/14/2022 | 11:39 AM CST

**HOLLI R. GIBSON**

Date: 11/14/2022 | 2:45 PM PST

13

23

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT A

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Location: _____



**FRANCHISE AGREEMENT**

**- between -**

**Salsarita's Franchising, LLC**

**- and -**

**Gibson Family Enterprises, LLC**

 Franchise Agreement

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 25 of 100

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Table of Contents

| | | Page |
|---|---|---|
| I. | GRANT | 1 |
| II. | TERM AND RENEWAL | 2 |
| III. | SITE SELECTION; CONSTRUCTION AND OPENING OF FRANCHISE | 3 |
| IV. | EQUIPMENT, FIXTURES AND FURNITURE | 5 |
| V. | TRAINING AND ASSISTANCE BY FRANCHISOR | 5 |
| VI. | OBLIGATIONS OF THE FRANCHISOR | 6 |
| VII. | FEES AND PAYMENTS BY FRANCHISEE | 7 |
| VIII. | ADVERTISING AND MARKETING | 9 |
| IX. | ACCOUNTING AND BOOKKEEPING RECORDS | 13 |
| X. | STANDARDS OF QUALITY AND PERFORMANCE | 14 |
| XI. | PROPRIETARY MARKS | 21 |
| XII. | CONFIDENTIALITY OF PROPRIETARY INFORMATION | 23 |
| XIII. | MODIFICATION OF THE SYSTEM | 25 |
| XIV. | INSURANCE OBLIGATIONS | 26 |
| XV. | TERMINATION OF FRANCHISE | 27 |
| XVI. | FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT | 30 |
| XVII. | RELATIONSHIP OF FRANCHISOR AND FRANCHISEE | 35 |
| XVIII. | COVENANTS | 37 |
| XIX. | ASSIGNMENT | 39 |
| XX. | OPERATION IN THE EVENT OF ABSENCE, INCAPACITY OR DEATH | 41 |
| XXI. | WAIVER | 41 |
| XXII. | ENFORCEMENT | 41 |
| XXIII. | TAXES, PERMITS AND INDEBTEDNESS | 44 |
| XXIV. | RESTRICTIONS ON GOODS AND SERVICES OFFERED BY FRANCHISEE | 45 |
| XXV. | VARYING STANDARDS | 45 |
| XXVI. | AUTHORITY | 46 |
| XXVII. | AUTHORIZED OFFICERS | 46 |
| XXVIII. | SPECIAL REPRESENTATIONS | 46 |

PAYMENT AND PERFORMANCE GUARANTEE

| EXHIBIT A | GENERAL INFORMATION |
|---|---|
| EXHIBIT B | THE PROPRIETARY MARKS |
| EXHIBIT C | RESTRICTIVE COVENANT TERRITORY |
| EXHIBIT D | CERTIFICATE OF AUTHORIZED OFFICERS |


26

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# SALSARITA'S FRANCHISING, LLC

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (this "**Agreement**") is made and entered into as of the date set forth on **Exhibit A** attached hereto (the "**Effective Date**") by and between **SALSARITA'S FRANCHISING, LLC**, a Mississippi limited liability company authorized to transact business in North Carolina with its principal place of business at the address set forth on **Exhibit A** ("**Franchisor**"), and the person or entity identified as Franchisee on **Exhibit A** ("**Franchisee**" or "**you**").

**WHEREAS**, Franchisor is engaged in the business of operating, and of licensing the operation by others of restaurant facilities under the mark SALSARITA'S® (the "**Restaurant**" or the "**Franchise**");

**WHEREAS**, Franchisor has originated, developed and perfected a distinctive system for the establishment, operation and merchandising of Restaurants, which system includes, but is not limited to, site selection, a distinctive and readily recognizable design, color scheme, decor, layout, trademarks and service marks, and signage for the business premises, equipment selection and installation, accounting and bookkeeping methods, merchandising, advertising and promotional techniques, personnel training and a confidential operations manual of operating procedures containing specially conceived and designed methods for Restaurant operations (collectively, the "**System**"); and

**WHEREAS**, Franchisee desires to establish and operate a Restaurant under the SALSARITA'S® mark and other service marks, trademarks, associated designs, artwork and logos set forth on **Exhibit B** attached hereto (all such marks, and all other marks, trade names, logos, art work and designs, whether now existing or hereafter incorporated into the System, shall be collectively referred to herein as the "**Proprietary Marks**");

**NOW, THEREFORE**, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## I. GRANT

    **A.**    <u>License</u>

        1.    Upon the terms and conditions of this Agreement, Franchisor grants to Franchisee a non-exclusive license to operate a Franchise using the Proprietary Marks and the System (the "**License**") at a location (the "**Designated Location**") to be agreed upon between Franchisor and Franchisee within a protected territory described in **Exhibit A** (the "**Protected Territory**"). Once agreed upon, the Designated Location shall be set forth on **Exhibit A** and initialed by the parties; provided that Franchisee shall have a right to relocate the Restaurant to another approved location in the Protected Territory upon payment of a $7,500 relocation fee to Franchisor and written approval of the new location obtained in accordance with Franchisor's site selection approval. Franchisee hereby accepts the License and agrees to operate the Franchise according to the provisions of this Agreement for the term of this Agreement specified in **Section II**.

        2.    Franchisee also has the right to provide off-premises catering services of authorized Salsarita's food products and beverages to businesses or other locations within the Protected Territory provided Franchisee follows all procedures and menu requirements, purchases all supplies, products and ingredients through approved suppliers, and otherwise follows the Manual (as defined in **Section X.Q.**) as to



Franchise Agreement

04/12

27

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

catering. Franchisee may, on a non-exclusive basis, offer catering services outside of the Protected Territory; however, Franchisor may, in its sole discretion at any time and from time to time, restrict the areas in which Franchisee is permitted to offer catering services outside of the Protected Territory.

**B.**  **Reservation**

Except within the Protected Territory, Franchisee has no exclusive territorial rights, protected territory or other right to exclude, control or impose conditions on the location or development of other or future Franchisor and affiliate-owned businesses and franchises under the Proprietary Marks or on Franchisor's business activities. Franchisor and its affiliates may establish Restaurants and grant licenses to third parties for Restaurants outside of the Protected Territory, and Franchisee has no right to restrict or control the development of such Restaurants. Franchisor may offer and sell franchises and establish Franchisor and affiliate-owned units that sell similar products or may allow others to sell similar products under marks other than the Proprietary Marks at any location. In addition, Franchisor reserves the right, on its own or through an affiliate, or through its franchisees, to develop non-traditional locations under the Proprietary Marks in airports, stadiums, educational institutions (including colleges & universities), bus stations, factories, federal, state or local government facility (including military bases), hospitals and other health-care facilities, recreations facilities, schools, warehouse clubs, seasonal facilities, casinos, theaters, museums, theme parks, train stations, enclosed shopping malls, lifestyle centers and workplace cafeterias both inside and outside of the Protected Territory. Salsarita's and its affiliates may also merchandise and distribute products identified by the Proprietary Marks in the Territory through any method or channel of distribution

## II.  TERM AND RENEWAL

**A.**  **Term**

This Agreement shall be effective and binding from the date of its execution for an initial term equal to the earlier of (i) the day before the tenth (10th) anniversary of the date that operations of the Franchise commence, and (ii) the eleventh (11th) anniversary of the Effective Date, unless earlier terminated pursuant to the provisions herein.

**B.**  **Successor Term**

Franchisee, upon the giving of one-hundred eighty (180) days written notice of its intention to enter into a successor term for the License, shall have the right to enter into a successor term for the License for two (2) consecutive successor terms of five (5) years each, provided that all of the following conditions have been fulfilled:

1. Franchisee has, during the term of this Agreement, fully complied with all its provisions, and is not in default of any term of this Agreement at the time of expiration of the initial term or any successor term;

2. Franchisee maintains possession of the Franchise location and, by the expiration date of this Agreement, has brought such Franchise location into full compliance with the specifications and standards then applicable at the time of expiration of the initial term (or any extension thereof) for Restaurants generally, and presents evidence satisfactory to Franchisor that it has the right to remain in possession of the Franchise location for the duration of any successor term; or, in the event Franchisee is unable to maintain possession of the Franchise location, or in the judgment of Franchisor, the Franchise should be relocated, Franchisee secures a substitute


Franchise Agreement

2

04/12

premises approved by Franchisor as provided herein and has furnished, stocked and equipped such premises to bring the relocated Franchise at its substitute location into full compliance with the then current specifications and standards of Franchisor for Restaurants by the expiration date of this Agreement and prior to the opening of the Franchise at the substitute location;

3.   Franchisee has satisfied all monetary obligations owed by Franchisee to Franchisor and any of its subsidiaries and affiliates and has timely met these obligations throughout the term of this Agreement;

4.   Franchisee has executed Franchisor's then current form of Franchise Agreement (with appropriate modifications to reflect the fact that the said agreement relates to the grant of a successor term for the License), which agreement shall supersede in all respects this Agreement the terms of which may differ from the terms of this Agreement, including, without limitation, a higher continuing Royalty Fee and/or local marketing expenditure and/or franchise-wide advertising contribution; provided, however, Franchisee shall not be required to pay the then current Initial Franchise Fee, but shall pay the successor term fee which shall be the higher of thirty percent (30%) of (a) the then current Initial Franchise Fee or (b) the original Initial Franchise Fee paid under this Agreement;

5.   Franchisee has complied with Franchisor's then current qualification and training requirements; and

6.   Franchisee has executed a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries and affiliates, if any, and their respective officers, directors, agents and employees.

## III.   SITE SELECTION; CONSTRUCTION AND OPENING OF FRANCHISE

### A.   Site Selection and Lease or Purchase Agreement

1.   Franchisee must obtain Franchisor's approval with respect to a location for the Franchise and the lease or purchase agreement for such location within one hundred and eighty (180) days after the Effective Date.

2.   Franchisor shall furnish to Franchisee site selection guidelines, site selection counseling and assistance that Franchisor considers necessary and appropriate, and such on-site evaluation(s) as Franchisor considers necessary and appropriate as part of its evaluation of Franchisee's request for approval of the location of the Franchise premises pursuant to **Section III.A.1**.   If Franchisor determines that on-site evaluation is necessary and appropriate (on its own initiative or at Franchisee's request), Franchisor shall provide one such evaluation (to last not more than two days unless otherwise agreed by Franchisor) at its own expense.   If Franchisor provides any additional on-site evaluations (at the same or any other location), Franchisee shall reimburse Franchisor for all reasonable costs and expenses incurred by Franchisor in relation to each such additional evaluation, including, without limitation, the cost of travel, lodging and meals for Franchisor's employees and agents.   In addition, Franchisee shall pay to Franchisor $500 per day for each employee or agent of Franchisor that performs such additional evaluation services. **IT IS THE RESPONSIBILITY OF FRANCHISEE TO SELECT A SUITABLE SITE FOR THE FRANCHISE.   FRANCHISOR RECOMMENDS THAT FRANCHISEE SEEK THE COUNSEL OF AN EXPERIENCED REAL ESTATE AGENT FAMILIAR WITH THE PROTECTED TERRITORY.**



Franchise Agreement

3

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**FRANCHISEE HEREBY ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S APPROVAL OF A PROPOSED SITE SHALL NOT CONSTITUTE A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE.**

3. After receiving Franchisor's written approval of the Franchise location, Franchisee shall either purchase the proposed Franchise location or execute a lease for such Franchise location upon terms that have been approved in advance by Franchisor. Franchisor's approval of the lease for the Franchise location may be conditioned upon inclusion in the lease terms such provisions as Franchisor may reasonably require, including, without limitation: (a) a provision reserving to Franchisor the right, at Franchisor's election, to receive an assignment of the leasehold interest upon termination or expiration of this Agreement, and a provision which requires the landlord for the Franchise location to, at Franchisor's option, execute a collateral assignment of lease in a form approved by Franchisor which provides that Franchisor will be allowed to take an assignment of Franchisee's lease for the Franchise location upon any termination of Franchisee's rights under this Agreement; (b) a provision which expressly permits the lessor of the premises to provide Franchisor with all sales and other information it may have related to the operation of the Restaurant, as Franchisor may request; (c) a provision which requires the lessor concurrently to provide Franchisor with a copy of any written notice of deficiency under the lease sent to Franchisee and which grants to Franchisor, in its sole discretion, the right (but not the obligation) to cure any deficiency under the lease, should Franchisee fail to do so within fifteen (15) days after the expiration of the period in which Franchisee may cure the default; (d) a provision which gives Franchisor, or its designee, the option, upon default, expiration or termination of this Agreement, and upon written notice to the lessor, to assume all of Franchisee's rights under the lease terms, including the right to assign or sublease; (e) a provision which evidences the right of Franchisee to display the Proprietary Marks in accordance with the specifications required by the Manual, subject to the provisions of applicable law; and (f) a provision that the premises shall be used only for the operation of the Restaurant. Franchisee agrees not to modify its lease for the Franchise location without the consent of Franchisor if such modification alters Franchisor's rights with respect to the above-noted provisions. Franchisee shall provide Franchisor with a fully executed copy of Franchisee's lease agreement within ten (10) days after execution. In the event of termination of this Agreement for cause, at the request of Franchisor, if Franchisee owns or purchases the Franchise location, Franchisee shall enter into a lease with Franchisor for a term of years equal to the remaining term of the Franchise Agreement, if said Agreement had not been terminated and at market rent for similar facilities.

B. **Commencement of Operations; Construction**

Franchisee agrees to open and commence operation of the Restaurant as soon as practicable after construction and/or remodeling of the Franchise location hereunder is completed. In no event shall such opening and commencement of operations be delayed beyond one hundred and eighty (180) days after securing the site and obtaining Franchisor's written approval of the site and the purchase agreement or lease agreement, as applicable, for the site. Franchisor may, at its option and in its sole discretion, consent in writing to an extension of the time period specified herein. If Franchisee does not commence operating the Restaurant within such one hundred and eight (180) day time period set forth herein, Franchisor may, at its option, terminate this Agreement.


Franchise Agreement

04/12

4

1.    Franchisor will assist Franchisee with the layout and design of the Franchise and provide advice to Franchisee (or its selected contractor) for construction and/or remodeling of the Franchise location. Franchisee shall not proceed with construction and/or remodeling of the Franchise location until Franchisee has obtained Franchisor's prior written approval of plans drafted by Franchisee's architect based on Franchisor's construction specifications. Franchisee agrees to completely construct and/or remodel, equip and furnish the Franchise location in accordance with Franchisor's specifications with respect to design, Equipment (as defined in **Section IV**), layout, decor, color scheme and signage, all at the expense of Franchisee. Franchisee shall be responsible for and shall pay all expenses associated with transforming Franchisor's construction advice into site blueprints for the Franchise location and in ensuring that such site blueprints comply with all codes, regulations or ordinances that may be applicable to the construction and/or remodeling of the Franchise location.

2.    All signs or sign faces, as the case may be, shall bear Franchisor's Proprietary Marks. Franchisee further agrees to obtain all necessary permits and to comply with all codes, regulations or ordinances applicable to display of the required signage, all at the expense of Franchisee. The maintenance and repair of all signs shall be the sole responsibility and obligation of Franchisee. Franchisee shall not display on the Franchise any sign or signs not furnished by Franchisor, unless Franchisor shall give its prior written consent. Franchisee must comply with Franchisor's sign criteria, as more fully set forth in the Manual.

3.    Franchisee shall have procured all necessary licenses, permits, and approvals, including, without limitation, construction permits and licenses, and shall have hired and trained personnel and procured a representative inventory as required by Franchisor.

## IV.   EQUIPMENT, FIXTURES AND FURNITURE

Franchisor may provide Franchisee with specifications for brands and types of any equipment, fixtures, furniture, displays, exterior and interior signs and decorating accessories required for the Restaurant (**"Equipment"**) to be purchased or leased at Franchisee's expense. Franchisee may purchase or lease original and replacement Equipment from any source that is approved by Franchisor. If Franchisee proposes to purchase or lease any item of Equipment not approved by Franchisor as meeting its specifications, as set forth in the Manual, Franchisee shall first obtain Franchisor's prior written approval in writing. Franchisor may require that Franchisees submit at its cost and expense photographs, drawings and/or other information and samples of the proposed substitute Equipment to determine whether such item meets Franchisor's specifications. Franchisor shall advise Franchisee within a reasonable period of time whether such item of Equipment meets its specifications. Any proposed Equipment not approved within sixty (60) days of receipt of Franchisee's written request shall be deemed disapproved. Franchisor may revoke any approval previously granted at any time in its reasonable discretion.

## V.   TRAINING AND ASSISTANCE BY FRANCHISOR

### A.   Initial Training and On-Site Assistance

Franchisor will provide initial training in Franchisor's methods and other policies and procedures. Such initial training shall be provided at no charge for up to two (2) persons at Franchisor's principal place of business or another location specified by Franchisor. Franchisee shall pay a reasonable fee and the cost of training materials for any additional

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

person that receives initial training and the cost of salaries, benefits, travel, and lodging and meal costs incurred by Franchisee for its employees and agents attending such initial training. The initial training program shall last not less than two weeks or such longer period of time as Franchisor prescribes. The training program shall be provided as soon as practicable after the execution and delivery of this Agreement (the **"Initial Training"**).

**B.**     **Additional Training**

Franchisor may periodically conduct additional or refresher training programs either online via Franchisor's Online University or on location at Franchisor's headquarters in Charlotte, North Carolina or at other locations designated by Franchisor. Franchisor may charge Franchisee a reasonable fee and the cost of training materials for employees and agents of Franchisee who attend an additional or refresher training program, including a pro rata annual maintenance and development fee for Franchisor's Online University or any successor online training program. Franchisor may increase the amount charged for additional or refresher training programs upon sixty (60) days prior written notice, but such fees may not be increased more than once during any six (6)-month period. Franchisee shall be responsible for salaries, benefits, travel, lodging and meal costs incurred by Franchisee for its employees and agents attending additional or refresher training. Franchisor may also require that designated employees of Franchisee attend and successfully complete, at Franchisee's cost, a ServSafe food safety training and certification program administered by the National Restaurant Association Educational Foundation.

**C.**     **Training for New Managers**

If, after the opening of the Franchise, Franchisee designates a new Manager (as defined in Section X.K.2.) for the Franchise, Franchisor shall provide training for such new Manager upon Franchisee's reasonable request and subject to the availability of Franchisor's personnel, which training will be similar to the initial training provided pursuant to Section V.A.1. Such training shall be provided at Franchisor's headquarters in Charlotte, North Carolina, or such other location designated by Franchisor, at a mutually convenient time. Franchisee shall pay to Franchisor for each such new Manager that receives such training a training fee equal to $250 per day and the cost of training materials, and Franchisee shall pay for such Manager's salary, benefits, travel, lodging and meal costs. Franchisor may increase the amount charged for new Manager training services upon sixty (60) days prior written notice, but such fees may not be increased more than once during any six (6)-month period.

**VI.**   **OBLIGATIONS OF THE FRANCHISOR**

**A.**     **Training and Pre-Opening Assistance**

Franchisor will provide a training program and pre-opening assistance concerning the operation of the Restaurant Operation as set forth in **Section V** of this Agreement.

**B.**     **Manual**

Franchisor shall loan to Franchisee one copy of the Manual containing mandatory and suggested specifications, standards and operating procedures prescribed from time to time by Franchisor, and information relative to other obligations of a Salsarita's franchisee, and to the operation of a Restaurant. The Manual will remain confidential and the property of Franchisor, constitutes a Trade Secret of Franchisor, and may not be loaned out, duplicated, or copied in whole or in part in any manner. At Franchisor's election, such Manual may be provided in electronic form.

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 32 of 100

**C.**     <u>Continuing Assistance</u>

Franchisor shall provide to Franchisee consulting services with respect to the operation of the Franchise upon Franchisee's reasonable request and subject to the availability of Franchisor's personnel. Franchisor shall provide such consulting services without charge at Franchisor's headquarters in Charlotte, North Carolina. If such services are rendered other than at Franchisor's headquarters, Franchisee will pay to Franchisor, the sum of (i) the travel, lodging and meal costs incurred by Franchisor for its employees and agents rendering such consulting services, plus (ii) $500 for each of such employees and agents for each day services are rendered. Franchisor may increase the amount charged for such requested consulting services upon sixty (60) days prior written notice, but such fees may not be increased more than once during any six (6)-month period. Such additional consulting services shall be rendered at a mutually convenient time.

**D.**     <u>Advertising and Promotion</u>

     1.     Franchisor may develop and provide creative materials for local and regional advertising and make such advertising materials available to its franchisees for publication or distribution in Franchisee's market area at Franchisee's own expense.

     2.     Franchisor may provide specific guidelines for advertising initiated by individual franchisees and shall reserve the right to disapprove any advertising which, in Franchisor's opinion, is not in accordance with these guidelines.

     3.     Immediately upon notification to do so, Franchisee shall discontinue any advertising that would, in Franchisor's opinion, be detrimental.

**E.**     <u>Pricing</u>

Franchisor may advise Franchisee from time to time concerning such suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation by Franchisor that the use of Franchisor suggested prices will generate or optimize profits.

## VII.    <u>FEES AND PAYMENTS BY FRANCHISEE</u>

**A.**     <u>Initial Franchise Fee</u>

Franchisee shall pay to Franchisor an initial franchise fee as set forth on **Exhibit A** (the **"Initial Franchise Fee"**). The Initial Franchise Fee is not refundable for any reason and shall be deemed fully earned by Franchisor upon payment.

**B.**     <u>Royalty Fees and Advertising Fund Contributions</u>

     1.     Franchisee shall pay to Franchisor royalty fees (the **"Royalty Fees"**) of five percent (5%) of monthly Net Revenues (as defined in **Section VII.D.**) Franchisor reserves the right in its sole discretion to increase the Royalty Fee due under this Agreement to six percent (6%) of monthly Net Revenues upon thirty (30) days advance notice to Franchisee.

     2.     Payment of Royalty Fees and the Advertising Obligation contributions (as defined in **Section VIII.C.**) are based on Net Revenues as calculated on a weekly basis as specified in the Manual and are due and payable on the dates specified on the

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Manual. Franchisor may require that Franchisee deliver to Franchisor certain reports containing calculations of Net Revenues, Royalty Fees and the Advertising Obligation contributions in a form specified in the Manual and require that Franchisee certify that the information contained in such reports is true and correct. At its option, Franchisor may calculate Net Revenues, Royalty Fees and the Advertising Obligation contributions based upon information that is retrieved, downloaded or otherwise accessed by Franchisor (via Internet connection or otherwise) from Franchisee's computer system. Franchisee agrees to take all actions and grant all such approvals that are reasonably necessary to provide such access.

3. The required payment method for Royalty Fees and the Advertising Obligation contributions is automatic debit draft from Franchisee's bank account. Franchisee shall permit Franchisor to withdraw Royalty Fees and the Advertising Obligation contributions from a bank account maintained by Franchisee which permits direct withdrawals by Franchisor on the due date for such payments as specified in the Manual. If Franchisee fails to submit reports relating to the calculation of Royalty Fees and the Advertising Obligation contributions by the due date for such reports as specified in the Manual, Franchisor shall give Franchisee prior written notice of its calculations of Franchisee's Net Revenues, Royalty Fees and the Advertising Obligation contributions as further specified in the Manual (the "**Fee Report**"). Franchisee shall have at least two (2) days after its receipt of the Fee Report within which to object to the calculations made by Franchisor. If, within such two (2)-day period, Franchisee does not provide Franchisor written notice of objection to the fee calculations provided by Franchisor (which notice shall describe in detail the reasons for its objection) Franchisor may withdraw Royalty Fees and the Advertising Obligation contributions based upon the calculations provided in its Fee Report. Franchisee shall maintain sufficient funds in such bank account to permit Franchisor to withdraw the Royalty Fees and the Advertising Obligation contributions due from time to time. Nothing herein contained shall prevent Franchisor from demanding that payments of Royalty Fees and/or the Advertising Obligation contributions be mailed or otherwise delivered to Franchisor.

4. If (a) the date on which any party is required to compute and notify the other of Net Revenues, Royalty Fees or the Advertising Obligation contributions or (b) the date on which Franchisee is required to make any payment hereunder is on a Saturday, Sunday or other day on which the commercial banks of Charlotte, North Carolina are authorized or required by law to close, then the obligation to notify the other party of such amounts or make such payment shall be the next day on which the commercial banks of Charlotte, North Carolina are open for business.

C. <u>**Interest for Late Payments**</u>

All Royalty Fees, the Advertising Obligation contributions, amounts due for purchases by Franchisee from Franchisor and/or any of its affiliated companies, and other amounts which Franchisee owes to Franchisor and/or its affiliated companies, not received on or before the due date shall be deemed overdue. If any payment or contribution is overdue, Franchisee shall pay to Franchisor immediately upon demand the overdue amount, a late fee of $100 per incident, plus interest on the overdue amount from the date it was due until paid, at the rate of one and one half percent (1½%) per month, or the maximum rate permitted by law, whichever is higher. The foregoing shall be in addition to any other remedies Franchisor may possess, as permitted by law. Franchisee acknowledges that his or her failure to pay all amounts when due shall constitute grounds for termination of this Agreement, as provided herein.



Franchise Agreement

8

04/12

### D. Definition of Net Revenues

"**Net Revenues**" means all revenue from the sale of all products, including all food and beverage products, all other products or services offered at or from the Restaurant, and all other income of every kind and nature related to, derived from, or originating from the Restaurant, including off-premises catering and special events, revenue from credit and debit machines, and proceeds of any business interruption insurance policies, whether at retail or wholesale (whether such sales are permitted or not), whether for case, check, or credit, and regardless of collection in the case of check or credit; provided, however, that "Net Sales" excludes any customer refunds, employee meals, customer discounts, coupon sales, sales taxes, and/or other taxes collected from customer by you and actually transmitted to the appropriate taxing authorities.

### E. Franchisor's Right to Apply Franchisee Payments

Notwithstanding any designation by Franchisee, Franchisor shall have the sole discretion to apply any payments by Franchisee to any past due indebtedness of Franchisee for Royalty Fee payments, purchases from Franchisor and any of its affiliates, interest or any other indebtedness.

## VIII. ADVERTISING AND MARKETING

Recognizing the value of marketing and the importance of the standardization of advertising and promotion to the furtherance of the goodwill and the public image of Restaurant, Franchisee agrees as follows:

### A. Grand Opening Marketing Expenditures

In addition to and not in lieu of the Advertising Obligation contributions, Franchisee shall expend at least Fifteen Thousand ($15,000) for grand opening advertising and promotional programs in conjunction with the Restaurant's initial grand opening, pursuant to a grand opening marketing program developed by Franchisor or developed by Franchisee and approved in writing by Franchisor. Franchisee shall submit to franchisor, for Franchisor's prior written approval, a marketing plan and samples of all advertising and promotional materials not prepare or previously approved by Franchisor.

If so requested by Franchisor, Franchisee shall also participate in a joint grand opening program with other Salsarita's franchisees in the same marketing area that are opening their Restaurant at about the same time as Franchisee. With regard to all advertising, Franchisee shall use the advertising materials, techniques and concepts of Franchisor and none other unless Franchisee obtains the prior written approval of Franchisor to use other materials, techniques and concepts.

### B. Minimum Requirements Only

Franchisee understands and acknowledges that the required contribution and expenditures are minimum requirements only and that franchisee may, and is encouraged by Franchisor to expend additional funds for the local advertising and promotion of a local nature which will focus on disseminating advertising direct related to the franchisee's restaurant.

### C. Contributions/Expenditures.

Franchisee will have an advertising obligation ("Advertising Obligation") as set forth in Exhibit A, but not to exceed 6% of Net Revenues. Following written notice to Franchisee,

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Franchisor may modify the amount and allocation of the Advertising Obligation subject to the provisions of Section VIII.G. Franchisee will pay Franchisor the Advertising Obligation at the same time and in the same manner as the Royalty Fee.

**D.** **Creative Fund.**

1. Franchisee must contribute to the Creative Fund the amount set forth in Exhibit A, as may be subsequently modified by Franchisor. Franchisor may use the Creative Fund contributions and any earnings of the Creative Fund for any costs associated with advertising, marketing, public relations, promotional programs and materials (which may be national or regional in scope) and/or any other activities that Franchisor believes would benefit the System, including the following: advertising campaigns in various media; point-of-purchase materials; review of locally-produced ads; free standing inserts; brochures; purchasing and/or developing promotional materials; market research, including secret shoppers; sponsorships; design and maintenance of a web site; celebrity endorsements; trade shows; association dues; search engine optimization costs; establishment of a third party facility for customizing local advertising; accounting costs; and holding an annual franchise convention. Franchisor will not use the Creative Fund for any activity whose sole purpose is the marketing of franchises; however, Franchisee acknowledges that the Salsarita's web site, public relations activities, community involvement activities and other activities that may be supported by the Creative Fund may contain information about franchising opportunities. Franchisor has the right to direct all programs supported by the Creative Fund, with final discretion over creative concepts, the materials and media used in the programs and their placement. Franchisor does not guarantee that Franchisee will benefit from the Creative Fund in proportion to its contributions to the Creative Fund.

2. Restaurants operated by Franchisor or its affiliates will contribute to the Creative Fund on the same basis as comparable franchisees. If Franchisor reduces the Creative Fund Contribution for franchisees, Franchisor will have the right to reduce the required contribution for applicable Restaurants operated by Franchisor or its affiliates by the same amount.

3. Any point-of-sale materials produced with Creative Fund monies will be made available to Franchisee at a reasonable cost, and the proceeds of such sales will be credited to the Creative Fund. Franchisor is not required to have an independent audit of the Creative Fund completed. Franchisor will make available an unaudited statement of contributions and expenditures for the Creative Fund no sooner than 150 days after the close of its fiscal year to franchisees who make a written request for a copy.

**E.** **Regional Co-op**

1. Franchisor, in its sole discretion, may establish a regional advertising and sales promotion cooperative ("Regional Co-op") in the regional area in which the Restaurant is located. Franchisee shall be a member of and contribute to the Regional Co-op such amount as is determined from time to time by Franchisor and/or the Regional Co-op, which, as of the date of this Agreement, is the amount specified in Appendix A. The Regional Co-op may be incorporated by Franchisor and will be operated in accordance with its charter, which Franchisor shall have the right to modify from time to time in its sole discretion.

 Franchise Agreement

04/12

2.     Franchisor or its designee shall have the right to terminate (and subsequently restart) the Regional Co-op. Upon termination, all monies in the Regional Co-op shall be spent for advertising and/or promotional purposes. Franchisor or its designee shall have the sole right, but not the obligation, to enforce the obligations of franchisees who are members of the Regional Co-op to contribute to the Regional Co-op and neither Franchisee nor any other franchisees who contribute to the Regional Co-op shall be deemed a third party beneficiary with respect to the Regional Co-op obligations of other franchisees or have any right to enforce the obligation of any franchisee to contribute to the Regional Co-op.

**F.**     **National Ad Fund**

1.     Franchisor may establish (and once established will maintain) a National Ad Fund for all Restaurants. Franchisee shall contribute to the National Ad Fund the amount set forth in Appendix A, as may be subsequently modified by Franchisor. Restaurants operated by Franchisor and its affiliates shall contribute to the National Ad Fund on the same basis as comparable franchisees.

2.     Franchisor or its designee shall direct all advertising, marketing, and public relations programs and activities financed by the National Ad Fund, with sole discretion over the creative concepts, materials and endorsements used in those programs and activities, and the geographic, market and media placement and allocation of advertising and marketing materials. Franchisee agrees that the National Ad Fund may be used to pay the costs of preparing and producing such associated materials and programs as Franchisor or its designee may determine, including video, audio and written advertising materials; employing advertising agencies; sponsorship of sporting, charitable or similar events; administering regional and multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising and employing advertising agencies to assist with these efforts; and supporting public relations, market research and other advertising, promotional and marketing activities. Franchisee agrees to participate in all advertising, marketing, promotions, research and public relations programs instituted by the National Ad Fund.

**G.**     **Local Store Marketing Fund**

1.     Franchisee will spend, at a minimum, that portion of the Advertising Obligation not otherwise spent or contributed pursuant to this Section VIII for local store marketing in authorized advertising media and for authorized advertising expenditures. Franchisor or its designee periodically will advise Franchisee of the authorized advertising media and authorized advertising expenditures.

2.     Franchisee is required to pay to Franchisor directly all of such local store marketing expenditures (at the same time as the Royalty Fee), and Franchisor will reimburse Franchisee up to such amount for approved local store marketing expenditures for which Franchisee provides Franchisor with evidence of such approved local store marketing expenditures according to procedures described in the Manual.

3.     Franchisee may not advertise the Restaurant in connection with any other business except with Franchisor's prior written approval. Franchisee agrees to conduct all marketing in a dignified manner and in accordance with the standards and requirements Franchisor specifies periodically. Franchisor may provide Franchisee a marketing manual, guidelines for creating a marketing plan, scripts and branding



DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

tools. Franchisee may be required to pay a reasonable fee for accessing and customizing local advertising and promotional materials. Franchisee agrees that all advertising and promotional materials must bear the Proprietary Marks in the form, color, location and manner that Franchisor prescribes. Franchisor will have the final decision on all creative development of advertising and promotional messages. Franchisee also agrees that Franchisor owns all advertising and promotional materials developed by Franchisee and Franchisee will take all actions Franchisor specifies to vest ownership in Franchisor.

4. Franchisee must submit to Franchisor in writing for Franchisor's prior acceptance all sales promotion materials and advertising that have not been prepared, or previously accepted, by Franchisor and identify the proposed media in which Franchisee intends to place the advertising. If Franchisor's written consent to the material and its proposed placement is not received within ten (10) days after the date that Franchisor received the material, the material may not be used. In no event will Franchisee's advertising or marketing materials contain any statement or material that, in Franchisor's sole discretion, may be considered: (A) in bad taste or offensive to the public or to any group of persons; (B) defamatory of any person or an attack on any competitor; (C) to infringe upon the use, without permission, of any other persons' trade name, trademark, service mark or identification; (D) inconsistent with the public image of the System or the Proprietary Marks; or (E) not in accordance with any federal or state law. Franchisor reserves the right to require Franchisee to discontinue the use of any advertising or marketing materials.

5. If requested by Franchisor, Franchisee shall create a local store marketing and marketing plan by which Franchisee shall place local store marketing in any media it desires, provided that such advertising conforms to the standards and requirements of Franchisor as set forth in Franchisor's Manual, or otherwise designated by Franchisor.

H. **Treatment of Payments to Franchisor**

1. Franchisor shall separately account for the Creative Fund and the National Ad Fund, but none of the funds shall be required to be segregated from Franchisor's other monies. None of the funds shall be used to defray any of Franchisor's general operating expenses. Each fund may hire employees, either full-time or part-time, for its administration. Franchisor and its affiliates may be reimbursed by each fund for expenses directly related to the fund's marketing programs including, without limitation, conducting market research, preparing advertising and marketing materials, and collecting and accounting for contributions to each fund. Franchisor may spend in any fiscal year an amount greater or less than the aggregate contribution of all Restaurants to each fund during that year or cause each fund to invest any surplus for future use by the fund. A statement of monies collected and costs incurred by each fund shall be prepared annually and shall be furnished to Franchisee within a reasonable period of time following a written request. Franchisor or its designee will have the right to cause each fund to be incorporated or operated through an entity separate from Franchisor at such time as Franchisor or its designee deems appropriate, and such successor entity shall have all rights and duties of Franchisor pursuant to this Section VIII.

2. Franchisee understands and acknowledges that each fund is intended to enhance recognition of the Proprietary Marks and patronage of Restaurants. Franchisor will endeavor to utilize each fund to develop advertising and marketing materials and



Franchise Agreement

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 38 of 100

programs, and to place advertising that will benefit the System and all Restaurants contributing to the fund. However, Franchisee agrees that Franchisor is not liable to Franchisee and Franchisee forever covenants not to sue and holds Franchisor harmless of any liability or obligation to ensure that expenditures by each fund in or affecting any geographic area (including the Franchised Location) are proportionate or equivalent to the contributions to the fund by Restaurants operating in that geographic area, or that any Restaurant will benefit directly or in proportion to its contribution to each fund from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Section VIII, neither Franchisor nor its designee assumes any direct or indirect liability to Franchisee with respect to the maintenance, direction or administration of each fund.

3.   Franchisor reserves the right, in its sole discretion, to: (A) suspend contributions to and operations of each fund for one or more periods that it determines to be appropriate; (B) terminate any fund upon 30 days' written notice to Franchisee and establish, if Franchisor so elects, one or more new advertising funds; and (C) upon the written request of any franchised or company Restaurants, defer or waive, in whole or in part, any advertising fees required by this Section if, in Franchisor's sole judgment, there has been demonstrated unique, objective circumstances justifying any such waiver or deferral. On termination of a fund, all monies in the fund shall be spent for advertising and/or promotional purposes. Franchisor has the right to reinstate any fund upon the same terms and conditions set forth in this Agreement upon thirty (30) days' prior written notice to Franchisee. Franchisor, in its sole discretion as it deems appropriate in order to maximize media effectiveness, may transfer monies from the Creative Fund to the National Ad Fund or from the National Ad Fund to the Creative Fund.

**I.   Changes in the Advertising Obligation.**

Franchisor has the right, following written notice to Franchisee, to reallocate the Advertising Obligation and to increase the Advertising Obligation; however, once Franchisor establishes a National Ad Fund, Franchisor will not increase the Advertising Obligation by more than 1% of Net Revenues in any 12 month period.

**IX.   ACCOUNTING AND BOOKKEEPING RECORDS**

**A.   Bookkeeping, Accounting and Records**

1.   Franchisee shall maintain during the term or terms of this Agreement, and shall preserve for a minimum of seven (7) years thereafter, full, complete accurate records of all sales, marketing activities, closeout sheets, payroll and accounts payable in accordance with the standard accounting system described by Franchisor in the Manual or otherwise specified in writing.

2.   Franchisee agrees to use computerized point of sale cash and data capture and retrieval systems that meet Franchisor's specifications and to record sales of the Restaurant electronically or on tape for all sales at or from the Franchise location.

3.   Franchisor may from time to time require information about Franchisee's financial condition, earnings, sales, profits, costs, expenses and performance to provide a basis for providing prospective franchisees of Franchisor with information concerning actual or potential earnings, to comply with applicable laws and regulations governing the offer and sale of franchises or to use solely for



benchmarking and similar informational purposes within Franchisor's franchise system. Franchisee shall provide such information promptly when so requested by Franchisor, and shall certify that such information is true and complete in all material respects. Franchisee hereby consents to the disclosure and use of such information in the manner described herein.

4.    Franchisee grants Franchisor access to Franchisee's financial and accounting records maintained via computer. Franchisor has the right to retrieve, download or otherwise access via Internet connection or otherwise such financial and accounting records.

**B.**    **Submission of Financial Statements**

Franchisee shall, at its expense, submit to Franchisor, within fifteen (15) days of the end of each quarter during the term of this Agreement, on forms prescribed by Franchisor, a financial statement, which may be unaudited, for the preceding month, including both an income statement and balance sheet. Franchisee shall also, at its expense, submit to Franchisor within sixty (60) days of the end of each fiscal year of Franchise during the term of this Agreement, a complete financial statement for the said fiscal year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as Franchisor may require. Each financial statement shall be certified by Franchisee attesting that the statement is true and correct and prepared in accordance with Franchisor's requirements. Franchisee shall also submit to Franchisor other records, reports, information and data as Franchisor may reasonably designate, in the form, and at the times and the places reasonably required by Franchisor. Upon thirty (30) days advance written notice, Franchisor may prepare the financial statements required under this **Section IX.B.** based upon financial and accounting information obtained by Franchisor from Franchisee or directly obtained from Franchisee's computer system in the manner described in **Section IX.A.4.** above. Franchisor may charge Franchisee a reasonable fee in connection with the preparation of such financial statements.

**C.**    **Franchisor's Right to Audit**

Franchisor has the right at any time during business hours and without prior notice to examine, compile, review, audit or cause to be audited all business records, financial and otherwise, relating to the Restaurant. If any such audit or review discloses an understatement of Net Revenues for any period or periods, Franchisee shall pay to Franchisor, within fifteen (15) days, all additional Royalty Fees and other fees or contributions required to be paid based upon the results of such audit or review. In addition, if there is an understatement of Net Revenues for any period, Franchisee shall reimburse Franchisor for the cost of such audit or review, including, without limitation, the costs of any independent accountant and the travel expenses, room and board, and compensation of any employees or agents of Franchisor.

**X.**    **STANDARDS OF QUALITY AND PERFORMANCE**

**A.**    **Image of Restaurant**

Franchisee agrees to maintain the condition and appearance of the premises of the Franchise location hereunder consistent with Franchisor's standards for the image of a Restaurant as an attractive, pleasant and comfortable Restaurant. Franchisee agrees to cause such reasonable maintenance of the Franchise location as is required from time to time to maintain or improve the appearance and efficient operation of the Franchise hereunder, including replacement of worn out or obsolete fixtures, furniture and signs, repair of the exterior and

interior of the Restaurant and decorating. If at any time in Franchisor's judgment the general state of repair or the appearance of the premises of the Franchise hereunder or its Equipment does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice, and thereafter continue, and promptly complete, a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Franchise and effect such maintenance on behalf of Franchisee, and Franchisee shall pay the costs thereof on demand.

**B.** **No Alteration to Restaurant**

Franchisee shall make no material alterations to the improvements of the Franchise hereunder nor shall Franchisee make material replacements of or alterations to the Equipment of the Franchise hereunder without the prior written approval by Franchisor.

**C.** **Use of Premises**

The Franchise location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of conducting Franchisor's business and System.

**D.** **Authorized Products and Services**

Franchisee agrees that he or she will offer for sale and sell at the Restaurant all types of merchandise, products and/or services that Franchisor from time to time authorizes and that he or she will not offer for sale or sell at the Restaurant any other category of merchandise, products or services, or use such premises for any purpose other than the operation of a Restaurant in full compliance with this Agreement.

**E.** **Sale of Trademarked or Copyrighted Product Lines**

Franchisee agrees, as part of the consideration for this Agreement, that Franchisee will carry an adequate supply and maintain a representative inventory of items and merchandise packaged under Franchisor's trademarks and/or copyrights, if any, and Franchisee shall maintain, carry and promote such items and merchandise for sale or lease to the general public in order to meet customer demands as designated by Franchisor.

**F.** **Approved Manufacturers, Suppliers and Distributors**

From time to time, Franchisor shall provide to Franchisee, a list of approved manufacturers, suppliers, and distributors for all products and services necessary to operate the Restaurant. Franchisor may revise the approved list of manufacturers, suppliers and distributors from time to time in its sole discretion. Such approved list shall be submitted to Franchisee as Franchisor deems advisable.

**G.** **Authorized Equipment, Fixtures, and Supplies**

All inventory, supplies and Equipment and related items used in the operation of the Restaurant shall conform to the specifications and quality standards established by Franchisor from time to time. Franchisee shall purchase all inventory, supplies, Equipment and other products and materials required for the operation of the Restaurant solely from suppliers (including manufacturers and distributors) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's reasonable standards and specifications for such items; who possess adequate quality control and capacity to meet

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Franchisee's needs properly and reliably; and who have been approved in writing by Franchisor and not thereafter disapproved. Franchisor has the right to require that Franchisee use only certain brands and to prohibit Franchisee from using other brands. If Franchisee desires to purchase any items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for approval of such items or shall request supplier to do so. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facility and that samples from the supplier be delivered at Franchisor's option either to Franchisor or to an independent consultant designated by Franchisor for testing. A charge not to exceed the reasonable cost of the inspection and the actual cost of the testing shall be paid by Franchisee or the supplier. Franchisor shall respond to Franchisee's request within a reasonable period of time, not to exceed sixty (60) days. Any approval not received within such sixty (60)-day time period shall be deemed disapproved. Franchisor reserves the right, at its option, to reinspect the facilities and products of such approved suppliers, from time to time, and to revoke its approval upon supplier's failure to continue to meet any of Franchisor's criteria for standards and specifications. Franchisor shall be entitled upon request, to periodically review inventory reports from Franchisee, including product identification and serial numbers, if applicable, for compliance with the foregoing requirements.

H.     **Specifications, Standards and Operating Procedures**

Franchisee agrees to fully comply with all mandatory specifications, standards, operating procedures and rules as in effect from time to time relating to:

1.     The safety, maintenance, cleanliness, function and appearance of the Restaurant and its Equipment and the maintenance thereof;

2.     Procedures regarding purchasing of any trademarked product line or copyrighted materials and other inventory items;

3.     Procedures and techniques regarding merchandising activities;

4.     Training, dress, general appearance and demeanor of the Restaurant's employees;

5.     Hours during which the Restaurant will be attended and open for business;

6.     Advertising and promotional programs, including franchise sales and other promotional materials to be displayed in the Restaurant;

7.     Use and retention of standard forms;

8.     Type, quantity and variety of Equipment, Trademarked Product Lines and Copyrighted Materials and inventory items;

9.     Use and illumination of signs, posters, displays and similar items;

10.    Identification of Franchisee as the owner of the Restaurant; and

11.    The handling of customer complaints.

12.    The gathering of customer feedback;

Mandatory specifications, standards, operating procedures and techniques and other rules prescribed from time to time by Franchisor in the Manual or otherwise communicated to



Franchise Agreement

16

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Franchisee in writing, shall constitute provisions of this Agreement, as if fully set forth herein. All references herein to this Agreement shall include all such mandatory specifications, standards and operating procedures and rules.

**I.**   **Licenses, Permits and Certificates**

Franchisee shall secure and maintain in force all required licenses, permits and certificates relating to the operation of the Restaurant and shall operate the Restaurant in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all government regulations relating to occupational hazards and health, consumer protection, equal opportunity, trade regulation, worker's compensation, unemployment insurance, withholding and payment of federal and state income taxes and social security taxes and sales, use and property taxes.

**J.**   **Products with the Proprietary Marks**

Franchisee shall in the operation of the Restaurant use and display, labels, forms and other paper products imprinted with the Proprietary Marks and colors as prescribed from time to time by Franchisor.

**K.**   **Training and Personnel**

1.   If Franchisee is owned by more than one individual, Franchisee shall designate and retain an individual to serve as the Operating Principal. The Operating Principal as of the date of this Agreement is designated on **Exhibit A** to this Franchise Agreement (the **"Operating Principal"**). The Operating Principal shall meet all of the following qualification: (A) the operating principal shall be an Owner (as defined in Section XIX.B.1) of at least 10% of Franchisee; (B) the Operating Principal shall, at a minimum, have full control over the day-to-day activities of the Restaurant and those other restaurants (that are franchised by Franchisor or its affiliates) operated by Franchisee in the same geographic area as the Restaurant, including control over the standards of operation and financial performance; (C) the Operating Principal shall devote full-time and best efforts to supervising the operation of the Restaurant and those other restaurants (that are franchised by Franchisor or its affiliates) operated by Franchisee in the same geographic area as the Restaurant and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility; (D) unless waived in writing by Franchisor, the Operating Principal shall maintain his primary residence within a reasonable driving distance of the Restaurant.; (E) the Operating Principal shall successfully complete Franchisor's management training program and any additional training required by Franchisor; and (F) Franchisor shall have approved the Operating Principal, and not have later withdrawn that approval.

If the Operating Principal no longer meets these qualifications, Franchisee must provide Franchisor written notice designating a qualified person to act as Operating Principal within thirty (30) days after the date the prior Operating Principal ceases to be qualified. Franchisor shall advise Franchisee whether it has approved the new Operating Principal within a reasonable time after receipt of Franchisee's notice. If Franchisor does not approve the proposed Operating Principal, Franchisee will have fifteen (15) days from its receipt of notice of the decision to advise Franchisor in writing of another person to act as Operating Principal who satisfies the preceding qualifications.



Franchise Agreement

04/12

2.    Franchisee shall designate a Manager (as defined below) at all times to manage the Franchise. **The initial and all subsequent "Managers"** of the Franchise may be Franchisee or the Operating Principal, or any other person approved in advance by Franchisor who demonstrates to Franchisor's reasonable satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; and has the aptitude and ability to operate the Franchise.

3.    Prior to opening the Franchise, the Manager of the Franchise and Franchisee, or if Franchisee is not an individual, the Operating Principal, shall personally attend and satisfactorily complete the initial training program described in **Section V.A.1**. Such persons shall also be present for the on-site assistance provided by Franchisor under **Section V.A.2**.

4.    Any other employees and agents of Franchisee who will be involved in the direct management and supervision of the Franchise (such employees and agents, Franchisee, if Franchisee is an individual, the Manager and the Operating Principal, if any, shall be collectively referred to herein as **"Management"**) and who are designated by Franchisor as needing initial training must also attend and satisfactorily complete Franchisor's initial training program prior to the opening of the Franchise. Management must also complete any additional or refresher training programs that are required by Franchisor from time to time after the Franchise commences operations, including recertification training to be conducted at the Restaurant.

5.    If after opening the Franchise, Franchisee designates a new Manager, such new Manager shall attend and satisfactorily complete such initial training as Franchisor requires from time to time prior to assuming his or her position.

**L.**    **Inventory and Supplies Prior to Opening**

Prior to commencement of operation of the Restaurant, Franchisee shall adequately supply the Restaurant with representative inventory, supplies, Equipment and related items as prescribed by Franchisor, and any other items of the type, quantity and quality as specified by Franchisor in the Manual.

**M.**    **Continued Use of Inventory and Supplies**

Franchisee agrees that the Restaurant shall at all times maintain an adequate inventory of all products and services required by Franchisor.

**N.**    **Use of Advertising and Promotional Activities**

All advertising and promotional activities that Franchisee conducts in any medium shall be conducted in a dignified manner and shall accurately promote, describe and otherwise represent the products and services of the Restaurant and shall have been approved in writing by Franchisor prior to their use by Franchisee. Franchisee agrees to refrain from any advertising or promotional practice which is unethical or may be injurious to the business or reputation of Franchisor or the goodwill associated with the Proprietary Marks.

**O.**    **Notice of Legal Proceedings**

Franchisee shall notify Franchisor in writing within five (5) days of the commencement of or the threatening of any action, suit, or proceeding, or of the issuance or the threatened


Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 44 of 100

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation, financial condition or reputation of the Restaurant.

**P.** **Internet Use**

Franchisee shall not use the Proprietary Marks in any Internet domain name or e-mail address, in the operation of any Internet web site, or on a social networking site or other future technological avenue without Franchisor's prior written consent. Franchisor may grant or withhold its consent in its sole discretion and may condition its consent on such requirements as Franchisor deems appropriate, including, among other things, that Franchisee obtain Franchisor's written approval of: (1) any and all Internet domain names and home page addresses related to the Restaurant; (2) the proposed form and content of any web site related to the Restaurant; (3) Franchisee's use of any hyperlinks or other links; (4) Franchisee's use of any materials (including text, video clips, photographs, images and sound bites) in which any third party has an ownership interest; and (5) any proposed modification of Franchisee's web site. Franchisor may designate the form and content of Franchisee's web site and/or require that any such web site be hosted by Franchisor or a third party who Franchisor designates, using one or more web sites that Franchisor owns and/or controls. Franchisor may charge Franchisee a fee for developing, reviewing and approving Franchisee's web site and/or for hosting the web site.

**Q.** **Manual**

Franchisee shall comply with and abide by each rule, procedure, standard, specification and requirement contained in Franchisor's operations manual, as it may be amended, modified or supplemented from time to time (as so amended, modified or supplemented, the **"Manual"**) and such other written or electronically transmitted rules, procedures, standards, specifications and requirements that may be issued by Franchisor from time to time. Franchisee acknowledges that Franchisor may unilaterally amend, modify or supplement the Manual at any time, so long as such amendments, modifications or supplements do not modify the fundamental rights of Franchisee under this Agreement and will, in the good faith opinion of Franchisor, benefit Franchisor and Franchisor's existing and future franchisees or shall otherwise improve Franchisor's System. Franchisee agrees to keep Franchisee's copy of the Manual up-to-date, and if there is any dispute as to the current contents of the Manual, the terms of Franchisor's master copy maintained at its headquarters shall control.

**R.** **Standards of Service; Reputation**

Franchisee shall at all times, give prompt, courteous, and efficient service to its customers. The Restaurant shall, in all dealing with its customers, suppliers, and the public at large, adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. Franchisee acknowledges the importance to the System, and to the Marks, of Franchisee' maintaining a reputation of good moral character, and for the reason Franchisee agrees to not engage in conduct which is offensive to decency, morality, or social properties and which , in the reasonable determination of Franchisor, is like to have an adverse effect upon the system.

**S.** **Guest Satisfaction Programs**

In order to (among other things) maintain and enhance the goodwill associated with the Proprietary Marks, the System and each Restaurant, Franchisee agrees to participate in programs initiated to verify guest satisfaction and/or Franchisee's compliance with all operational and other aspects of the System, including (but not limited to) guest satisfaction

programs/surveys, an 800 number, secret shoppers or other programs as Franchisor may require. Franchisor will share the results of these programs, as they pertain to the Restaurant, with Franchisee. Franchisee will reimburse Franchisor for all costs related to the Franchised Restaurant associated with any and all of these programs.

T.     **Hardware and Software**

1.     Franchisee agrees to procure and install such data processing equipment, computer hardware and software, required dedicated telephone, DSL and power lines, high speed Internet connections, modems, printers and other computer-related accessory or peripheral equipment (collectively, "Computer Equipment") as Franchisor specifies in the Manual or otherwise. All of the foregoing must be able to provide Franchisor that information, in that format/medium, as Franchisor reasonably may specify from time to time. Franchisee shall provide all assistance required by Franchisor to bring Franchisee's Computer Equipment on-line with the computer system designated by Franchisor and maintained by Franchisor or its affiliates at the earliest possible time. Franchisee agrees that Franchisor shall have the free and unfettered right to retrieve any data and information from Franchisee's Computer Equipment as Franchisor, in its sole discretion, deems appropriate, including electronically polling the daily sales, menu mix and other data of the Restaurant. All of the hardware and software specified to be installed or purchased, or activities Franchisee is to accomplish, and the delivery cost of all hardware and software, shall be at Franchisee's expense.

2.     Franchisee shall: (A) use the proprietary software program, system documentation manuals and other proprietary materials now and hereafter required by Franchisor in connection with the operation of the Restaurant; (B) if requested by Franchisor, execute Franchisor's software license or similar agreement; (C) input and maintain in Franchisee's Computer Equipment such data and information as Franchisor prescribes in the Manual, software programs, documentation or otherwise; and (D) purchase new or upgraded software programs, system documentation manuals and other proprietary materials at then-current prices whenever adopted system-wide by Franchisor.

3.     Franchisee acknowledges that Computer Equipment is designed to accommodate a finite amount of data and terminals, and that, as these limits are reached, or as technology or software is developed in the future, Franchisor may, in its sole discretion, mandate, at any time during the term of this Agreement, that Franchisee: (A) add memory, ports and other accessories or peripheral equipment or additional, new or substitute software to the original Computer Equipment purchased by Franchisee; and (B) replace or upgrade the Computer Equipment with a larger system capable of assuming and discharging the computer-related tasks and functions specified by Franchisor. Franchisee also acknowledges that computer designs and functions change periodically and that Franchisor may desire to make substantial modifications to its computer specifications or to require installation of entirely different systems at any time during the term of this Agreement or upon renewal of this Agreement.

4.     To ensure full operational efficiency and communication capability between Franchisor's Computer Equipment and those of all Salsarita's Restaurants, Franchisee agrees, at its expense, to keep its Computer Equipment in good maintenance and repair and to make additions, changes, modifications, substitutions and replacements to its computer hardware, software, telephone and power lines and

 Franchise Agreement

20                                                          04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

other computer-related facilities as directed by Franchisor, and on the dates and within the times specified by Franchisor in its sole discretion. Upon termination and expiration of this Agreement, all computer software and related materials obtained from Franchisor shall be returned to Franchisor in good operating condition, excepting normal wear and tear.

### U.   Non-Cash Payment Systems/Loyalty Program

Franchisee shall participate, at its expense, in Franchisor's loyalty program. Franchisee shall accept debit cards, credit cards, stored value gift cards or other non-cash payment systems specified by Franchisor to enable customers to purchase authorized products from the Restaurant and shall obtain, at Franchisee's expense, all necessary hardware and/or software used in connection with these non-cash payment systems and Franchisor's loyalty program. Franchisee shall reimburse Franchisor for any and all costs associated with such non-cash payment systems as they pertain to the Restaurant that Franchisor may incur.

## XI.   PROPRIETARY MARKS

### A.   Franchisor's Ownership of Proprietary Marks

Franchisee acknowledges and agrees that Franchisor is the owner of the Proprietary Marks, and Franchisee's right to use the Proprietary Marks is derived solely from this Agreement and is limited to the conduct of the business by Franchisee pursuant to and in compliance with this Agreement and all applicable standards, specifications, and operating procedures prescribed by Franchisor from time to time during the term of this Agreement. Any unauthorized use of the Proprietary Marks by Franchisee is a breach of this Agreement and an infringement of the rights of Franchisor in and to the Proprietary Marks. Franchisee acknowledges and agrees that all usage of the Proprietary Marks by Franchisee and any goodwill established by Franchisee's use of the Proprietary Marks shall inure to the exclusive benefit of Proprietary Marks upon Franchisor. Franchisee shall not, at any time during the term of this Agreement, or after its termination or expiration, contest the validity or ownership of any of the Proprietary Marks or assist another person in contesting the validity or ownership of any of the Proprietary Marks. All provisions of this Agreement applicable to the Proprietary Marks apply to any additional trademarks, service marks, and commercial symbols authorized for use by and licensed to Franchisee by Franchisor after the date of this Agreement.

### B.   Franchisee's Use of Proprietary Marks

Franchisee shall not use any Proprietary Marks as part of any corporate or trade name, or with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form, nor may Franchisee use any Proprietary Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee agrees to give such notices of trademark and service mark registrations as Franchisor specifies and to obtain such fictitious or assumed named registrations as may be required under applicable law or as requested by Franchisor. Franchisee shall not use any of the Proprietary Marks in any manner which has not been specified or approved by Franchisor prior thereto.

### C.   Unauthorized Use of Proprietary Marks

Franchisee shall immediately notify Franchisor in writing of any apparent infringement of or challenge to Franchisee's use of the Proprietary Marks, which it becomes aware of, and of any claim by any person of any right in the Proprietary Marks or any similar trade name,

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

trademark, or service mark of which Franchisee becomes aware. Franchisee shall not directly or indirectly communicate with any person other than Franchisor and its counsel in connection with any such infringement, challenge, or claim. Franchisor shall have sole discretion to take such action as it deems appropriate and shall have the right to exclusively control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of such infringement, challenge or claim or otherwise relating to the Proprietary Marks. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of Franchisor's counsel, be necessary or advisable to protect and maintain the interests of Franchisor in any such litigation, U.S. Patent and Trademark Office proceeding, or other administrative proceeding or to otherwise protect and maintain the interests of Franchisor in the Proprietary Marks.

**D.**     **Franchisor's Right to Modify**

If it becomes advisable at any time in Franchisor's sole discretion, for Franchisor and/or Franchisee to modify or discontinue use of the Proprietary Marks, and/or use one or more additional or substitute trade names, trademarks, service marks, or other commercial symbols, Franchisee agrees to comply with Franchisor's directions within a reasonable time after notice to Franchisee by Franchisor. Franchisor shall have no liability or obligation whatsoever with respect to Franchisee's modification or discontinuance of the Proprietary Marks prescribed herein. Franchisee agrees that any costs for modifying or changing the Proprietary Marks will be borne by Franchisee and such modification or change of Proprietary Marks will be completed by Franchisee within a reasonable period of time after notification by Franchisor.

**E.**     **Franchisor's Right to Inspect Restaurant**

In order to preserve the validity and integrity of the Proprietary Marks and copyrighted materials licensed herein, and to assure that Franchisee is properly employing the same in the operation of its Restaurant, Franchisor or its agents shall have the right of entry and inspection of Franchisee's premises at all reasonable times. Franchisor or its agents shall have the right to confer with Franchisee's employees and customers, and to inspect Equipment and related merchandise, trademarked product lines, other merchandise, supplies or inventory for evaluation purposes in order to make certain that the Equipment and related merchandise, trademarked product lines, and other merchandise, supplies, inventory, services and operations are satisfactory and meet the quality control provisions and performance standards established by Franchisor from time to time.

**F.**     **Injunctive Relief Available to Franchisor**

Franchisee agrees that Franchisor, notwithstanding the provisions of **Section XXII.A.** regarding mediation and dispute resolution, that due to the nature of the irreparable harm and injury Franchisor, Salsarita's franchisees and the System will suffer if the Proprietary Marks are infringed upon or otherwise violated or misused by Franchisee following termination of this Agreement or otherwise, Franchisor may apply for injunctive relief to protect the Proprietary Marks in a state or federal court of competent jurisdiction located in Mecklenburg County, North Carolina, or the Western District of North Carolina, and Franchisee hereby consents to personal jurisdiction and venue in such courts. Franchisee agrees that any uses of the Proprietary Marks in any matter other than as provided in this Agreement shall constitute irreparable harm and injury to Franchisor and the System.

 Franchise Agreement

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

## XII. CONFIDENTIALITY OF PROPRIETARY INFORMATION

### A. Definitions

For purposes of this Agreement, the following terms have the following meanings:

"**Confidential Information**" means valuable and proprietary confidential business information or data other than Trade Secrets (as defined below). Confidential Information also includes any items specifically designated as a Trade Secret that are ultimately determined under applicable law not to constitute a trade secret but that otherwise meet the definition of Confidential Information. **FRANCHISEE ACKNOWLEDGES THAT THE TERMS OF THE MANUAL ARE CONFIDENTIAL INFORMATION.**

"**Trade Secrets**" means information (including, but not limited to, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

### B. Non-Disclosure Covenant

Franchisee acknowledges that he, she or it may be exposed to certain Confidential Information and Trade Secrets of Franchisor during the term of the Franchise Agreement, and that his, her or its unauthorized use or disclosure of such information or data could cause immediate and irreparable harm to Franchisor. Accordingly, except to the extent that it is necessary to use such information or data to perform his or her express obligations under this Agreement, Franchisee shall not (and shall take diligent measures to ensure that none of its employees or other personnel shall), without the express prior written consent of Franchisor, publish, disclose, transfer, release or divulge to any other person or entity, or use or modify for use, directly or indirectly, in any way for any person or entity:

1. Any of the Confidential Information during the term of this Agreement and for a period of two (2) years after the termination of this Agreement; and

2. Any of the Trade Secrets at any time during which such information shall constitute a Trade Secret before or after termination of this Agreement. The Parties acknowledge and agree that Franchisor's Trade Secrets include, but are not limited to: product marketing and promotional techniques and plans; financial data and plans; and any components of the System that fall within the definition of a Trade Secret. **THE PARTIES ACKNOWLEDGE AND AGREE THAT THE FRANCHISOR'S CONFIDENTIAL INFORMATION INCLUDES, BUT IS NOT LIMITED TO: THE CONTENTS OF THE MANUAL (EXCEPT FOR ANY INFORMATION IN THE MANUAL THAT WOULD CONSTITUTE A TRADE SECRET); AND ANY COMPONENT OF THE SYSTEM THAT DOES NOT CONSTITUTE A TRADE SECRET BUT THAT OTHERWISE MEETS THE DEFINITION OF "CONFIDENTIAL INFORMATION."**

 Franchise Agreement

23

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 49 of 100

**C.** **Injunctive Relief Available to Franchisor**

Franchisee acknowledges that any failure to comply with the requirements of this **Section XII** of this Agreement will cause Franchisor, Salsarita's franchisees and the System irreparable harm and injury, and Franchisor shall be entitled to obtain specific performance of, or an injunction against any violation of, such requirements. Franchisee agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, or an injunction against, any violation of the requirements of this Agreement. The foregoing remedies shall be in addition to any other legal or equitable remedies which Franchisor may possess. Franchisee agrees that notwithstanding the requirements regarding dispute resolution as set forth in **Section XXII.A.** below, Franchisor, due to the nature of the irreparable harm and injury Franchisor, Salsarita's franchisees, and the System will suffer if the requirements of this Section of this Agreement are violated, may apply for injunctive relief to a state or federal court of competent jurisdiction located in Mecklenburg County, North Carolina, or the Western District of North Carolina, and Franchisee hereby consents to personal jurisdiction and venue in such courts.

**D.** **Franchisee's Employees Will Not Disclose Proprietary Information**

Franchisee may disclose the Proprietary Information only to such of its employees, agents and representatives as must have access to it in order to operate the Restaurant. Franchisee shall obtain from each such employee, representative or agent, a non-disclosure agreement that is in a form and substance reasonably satisfactory to Franchisor.

**E.** **Franchisor's Patent Rights and Copyrights**

Franchisor does not own rights in, or to, any patents that are material to the Franchise. However, Franchisor claims a copyright in the Manual and certain marketing, sales, and operations literature.

**F.** **Ownership of Newly Developed Products and Services**

Franchisee must fully and promptly disclose to Franchisor all ideas, names, concepts, methods and techniques relating to the development, operation or promotion of his or her Restaurant, conceived or developed by him or her or by employees during the term(s) of this Agreement. Franchisor has the perpetual right to use and authorize other Restaurants to use such ideas, names, concepts, methods and techniques and, if incorporated into Franchisor's System for the development, operation or promotion of Restaurants, such ideas, names, concepts, methods and techniques become the sole and exclusive property of Franchisor without any consideration to Franchisee, in as much as they are derivative ideas or products of Franchisor's Proprietary Information.

**G.** **Trade Dress**

Franchisee acknowledges and agrees that portions of the Restaurant décor and design constitute unique and protectable images to the consumer which are identified with the System and which are part of the goodwill associated with the System. Franchisee agrees that all usage of Restaurant décor and design elements prescribed by Franchisor for the Restaurant and any goodwill established thereby shall insure to the exclusive benefit of the Franchisor. This Agreement does not grant any ownership or other interest in the Restaurant décor and design elements to Franchisee.



Franchise Agreement

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

## XIII. MODIFICATION OF THE SYSTEM

### A. System Modifications.

Franchisor, in its sole discretion, shall be entitled from time to time to change or modify the System, including modifications to the Manual, the menu and menu formats, the required equipment, the signage, the building and premises of the Restaurant (including the trade dress, decor and color schemes), the presentation of the Proprietary Marks, the adoption of new administrative forms and methods of reporting and of payment of any monies owed to Franchisor (including electronic means of reporting and payment) and the adoption and use of new or modified Proprietary Marks or copyrighted materials. Franchisee shall accept and use or display in the Restaurant any such changes or modifications in the System as if they were a part of the System at the time this Agreement was executed, and Franchisee will make such expenditures as the changes or modifications in the System may reasonably require.

### B. New Menu Items.

Within 30 days after receipt of written notice from Franchisor, Franchisee shall begin selling any newly authorized menu items and cease selling any menu items that are no longer authorized. All food, beverage and merchandise items authorized for sale at the Restaurant shall be offered for sale under the specific name designated by Franchisor. Franchisee shall establish menu prices in its sole and absolute discretion. If Franchisee has a suggestion for a new menu item or for a change to an authorized menu item or Franchisee desires to participate in a test market program, Franchisee shall provide Franchisor written notice prior to implementation. Franchisee shall not add or modify any menu item or participate in a test market program without first having obtained Franchisor's prior written approval. Franchisee shall purchase any additional equipment and smallwares as Franchisor deems reasonably necessary in connection with new menu items. If Franchisor requires Franchisee to begin offering a new menu item which requires the purchase of additional equipment, a reasonable period of time, as determined in the sole discretion of Franchisor, shall be provided for the financing, purchase and installation of any such equipment before such new menu items must be offered for sale at the Restaurant.

### C. Remodeling.

Extensive structural changes, major remodeling and renovations, and substantial modifications to existing equipment and improvements to modernize and conform the Restaurant to the image of the System for new franchised and company restaurants shall be required at Franchisor's request (but not more often than every 5 years). Capital expenses necessary for the repair and maintenance of the Franchise location are not subject to the time limitations described in the preceding sentence. Within 60 days after receipt of Franchisor's written notice regarding the required modernization, Franchisee shall prepare and complete drawings and plans for the required modernization. These drawings and plans must be submitted to, and their use approved by, Franchisor prior to the commencement of work. Franchisee shall complete the required modernization within the time reasonably specified by Franchisor in its written notice.

### D. Variations.

Franchisor has the right, in its sole discretion, to waive, defer or permit variations from the standards of the System or the requirements imposed by any agreement to any franchisee or prospective franchisee based on the peculiarities of a particular site, existing building configuration or circumstance, density of population, business potential, trade area

population or any other condition or circumstance. Franchisor shall have the right, in its sole discretion, to deny any such request Franchisor believes would not be in the best interests of the System.

E.    **Ownership of Improvements.**

If Franchisee develops any new concepts, processes or improvements relating to the System, whether or not pursuant to an Franchisor authorized test, Franchisee promptly shall notify Franchisor and provide Franchisor with all information regarding the new concept, process, or improvement, all of which shall become the property of Franchisor and its affiliates and which may be incorporated into the System without any payment to Franchisee. Franchisee, at its expense, promptly shall take all actions deemed necessary or desirable by Franchisor to vest in Franchisor ownership of such concepts, processes or improvements.

## XIV. INSURANCE OBLIGATIONS

A.    **Overall Insurance Coverage Required**

Franchisee must procure, prior to opening the Restaurant and shall maintain in full force and effect during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisor, and the officers, directors, partners, agents and employees of both Franchisor and Franchisee, against any loss, liability, personal injury, death, property damage or expense whatsoever arising from or occurring upon or in connection with operating the Restaurant. Franchisor must be named as an additional insured on all such policies.

B.    **Qualified Insurance Carrier**

All insurance policies required under this Agreement shall be written by an insurance company with an A.M. Best Rating of at least A Minus VII and otherwise satisfactory to Franchisor, naming Franchisor as an additional insured, whenever possible, in accordance with standards and specifications set forth in the Manual or otherwise specified in writing, and shall include, at a minimum (except as higher policy limits may reasonably be specified from time to time by Franchisor), the limits set forth in the Manual for the following categories of required insurance, and any additional categories required by Franchisor, as set-forth in the Manual.

1.    Commercial General Liability insurance including but, not limited to, product liability, premises liability, advertising injury or insult, and Hired & Non-owned Auto liability;

2.    Commercial Auto Liability for all company owned Autos of not less than $1,000,000 combined single limit per occurrence;

3.    Property Coverage written on a special form covering the total insured value of tenant's betterments and improvements and business personal property on a replacement cost basis, when permitted;

4.    Workers Compensation and Employer's Liability Insurance as required by law; subject to Franchisor's then current minimum coverages, if applicable;

5.    Umbrella Liability for all underlying liability policies;

6.    Employment Practices Liability Coverage (EPLI); and

7.      Such other insurance that may be required by the statutes or other laws of the state or any local governmental entity in which the Restaurant is located and operated.

**C.**     **No Limitations on Coverage**

Franchisee's obligations to obtain and maintain the foregoing insurance policies, in the policy limits set forth in the Manual, shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of this obligation relieve it of liability under the indemnity provisions set forth in this Agreement. Franchisee may maintain such additional insurance as it may consider advisable.

**D.**     **Evidence of Coverage**

Upon obtaining the insurance required by this Agreement and on each policy renewal date thereafter, Franchisee must promptly submit evidence of satisfactory insurance and proof of payment thereof to Franchisor, together with, upon request, copies of all policies and policy amendments and endorsements. The evidence of insurance shall include a statement by the insurer that the policy or policies will not be cancelled or materially altered without giving at least thirty (30) days' prior written notice to Franchisor.

**E.**     **Franchisor May Procure Insurance Coverage**

Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as described from time to time by the Manual or otherwise in writing, a breach of this Agreement shall result. Franchisor shall then have the right and authority (but no obligation) to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice from Franchisor.

**F.**     **Certificate of Insurance**

Franchisee must submit to Franchisor, at least annually, and otherwise upon request by Franchisor a copy of the certificate of renewal or other evidence of the renewal, existence or extension of such insurance policies.

**XV.**    **TERMINATION OF FRANCHISE**

**A.**     **By Franchisee**

If Franchisee is in compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to Franchisor, then Franchisee may terminate this Agreement and the Franchise effective thirty (30) days after delivery to Franchisor of notice thereof. Any termination of this Agreement and the Franchise by Franchisee, without complying with the foregoing requirements, or for any reason other than a material breach of this Agreement by Franchisor and Franchisor's failure to cure such material breach within thirty (30) days after receipt of written notice thereof, shall be deemed a termination by Franchisee without cause.

**B.**     **By Franchisor**

Franchisee acknowledges that the strict performance of all the terms of this Agreement is necessary not only for protection of Franchisor, but also for the protection of Franchisee and other franchisees of Franchisor. As a result, Franchisee therefore acknowledges and agrees

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

that strict and exact performance by Franchisee of each of the covenants and conditions contained in this Agreement is a condition precedent to the continuation of this Agreement. If Franchisee shall breach any provision of this Agreement, then Franchisor shall notify Franchisee in writing of such breach, specifying its nature and giving Franchisee thirty (30) days in which to remedy same, except as set forth in **subsection C** below. If Franchisee shall fail to remedy such breach during said thirty (30) days, then Franchisor can terminate this Agreement and the Franchise effective immediately upon receipt by Franchisee of notice of termination. If applicable law requires that Franchisee be allowed more that thirty (30) days to remedy such breach, then Franchisee shall be given such longer time to remedy such breach.

C.     <u>**Termination of Franchise -- Without Cure.**</u>

Notwithstanding the foregoing, Franchisee shall be deemed to be in breach and Franchisor, at its option, may terminate this Agreement and all rights granted under it, without affording Franchisee any opportunity to cure the breach, effective immediately upon Franchisor notifying Franchisee in writing of such breach, upon the occurrence of any of the following events of default:

1.     Franchisee fails to pay when due any fee, expense, charge or other amount due and owing to Franchisor or any of its affiliates after five (5) days written notice thereof; or if Franchisee has previously been given at least two (2) notices of nonpayment for any reason within the last twenty four (24) months and Franchisee thereafter fails to timely pay when due any fee, expense, charge or other amount;

2.     Franchisee fails to pay when due any fee, expense, charge or other amount due and owing to any creditor of Franchisee after ten (10) days written notice thereof from Franchisor;

3.     Franchisee abandons, surrenders, or transfers control of the operation of the Restaurant or fails to continuously and actively operate the Restaurant, unless precluded from doing so by events beyond Franchisee's reasonable control;

4.     On two (2) or more occasion during any twelve (12)-month period Franchisee fails or refuses to submit when due any financial statement, tax return or other report required under this Agreement or submits to Franchisor (a) financial statements or other information or supporting records during any two-year period that understate by more than two percent (2%) Franchisee's Net Revenues, or (b) any financial statement or other information or supporting record that intentionally understates the Net Revenues or distorts any other material information;

5.     Franchisee files a petition for relief from its or his debts, liabilities or obligations, or for appointment of a receiver for Franchisee or for all or a substantial portion of Franchisee's assets, or makes a general assignment for the benefit of Franchisee's creditors; or a petition is filed against Franchisee or a receiver is appointed for Franchisee or for all or a substantial portion of Franchisee's assets, or a judgment is entered against Franchisee, and such petition, appointment or judgment is not stayed or vacated or otherwise discharged within sixty (60) days or becomes unappealable or is acquiesced in or consented to by Franchisee;

6.     Any of the representations of Franchisee herein or in any other instrument, document or certificate furnished pursuant to this Agreement or in connection therewith is untrue in any material respect or omits any material fact necessary to make any such representations not misleading in light of the circumstances in which

 Franchise Agreement

28

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

such representation was made;

7.  Franchisee engages in any Transfer that requires Franchisor's prior written approval without Franchisee's having obtained that prior written approval.

8.  Franchisee becomes bankrupt, insolvent or otherwise unable to pay Franchisee's obligations as they become due;

9.  Franchisee discloses or divulges the contents of the Manual, or any other Confidential Information or Trade Secret provided to Franchisee by Franchisor or any of its affiliates to any third party;

10. Franchisee or any Owner of Franchisee is convicted of a felony, a crime involving moral turpitude or consumer fraud, or any other crime or offense that Franchisor believes is likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interests therein;

11. Within one hundred and eighty (180) days after the Effective Date, Franchisee has not obtained from Franchisor approval of Franchisee's proposed site and lease agreement or purchase agreement or, within one hundred and eighty (180) days after Franchisor's approval of the site for the Franchise and the lease or purchase agreement, Franchisee fails to commence operations of the Franchise;

12. Franchisee or any Owner acquires any interest in a business in violation of **Section XVIII.C.**;

13. If a threat or danger to public safety results form the construction, maintenance or operation of the Restaurant or Franchisee breaches or fails to comply with any law, regulation or ordinance that results in a threat to the public's health or safety, and fails to cure the non-compliance within twenty four (24) hours following receipt of notice thereof from Franchisor or applicable public officials, whichever occurs first, expense, charge or other amount;

14. Franchisee operates the Restaurant in an unlawful manner without any required license or permit;

15. Franchisee misuses or makes any unauthorized use of the Proprietary Marks, engages in any business or markets a service or products under a name or mark that is confusingly similar;

16. Franchisee defaults under its lease agreement for the Restaurant premises and fails to cure the default within the applicable grace period;

17. Franchisee or any member of Management fails to attend and successfully complete any mandatory training program as require by the Franchisor.

18. Franchisee fails to obtain Franchisor's prior written approval of any and all advertising, marketing or promotional plans and materials used by Franchisee in connection with its promotion of the Restaurant or otherwise fails to comply with Franchisor's policies and procedures with respect to advertising, marketing, or promotion.

19. Franchisee offers through the Restaurant or on the Restaurant premises any product or service that is not approved by Franchisor;

 Franchise Agreement

29

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 55 of 100

20. An event of default occurs under the terms and conditions of any other agreement between Franchisor (or any of its affiliates) and Franchisee (or any of its affiliates), including, but not limited to, any other Franchise Agreement or any Area Development Agreement or Area Representative Agreement, and such event of default provides Franchisor with the right to terminate such agreement; or

21. Franchisee commits three or more breaches of this Agreement within any twelve (12)-month period, whether or not Franchisee cures any or all of such breaches; such breaches need not be of the same provision of this Agreement.

22. On two (2) or more occasion during any twelve (12)-month period Franchisee fails to maintain operating standards (as defined herein and in the Manual) and fails to correct deficiencies in operations after being notified by Franchisor through any means including but not limited to an announced or unannounced on-site inspection.

No such termination of this Agreement shall relieve Franchisee of any of Franchisee's obligations, debts or liabilities hereunder, including, without limitation, any debts, obligations or liabilities that have accrued prior to such termination, nor shall any such termination relieve Franchisee of any damages Franchisor may suffer or incur as a result of such early termination, including, without limitation, damages resulting from loss of future Royalty Fees or Creative Fund contributions. The right of termination granted herein is in addition to, and not in lieu of, any and all other rights and remedies available to Franchisor at law, in equity or otherwise, all of which are cumulative. Franchisor has no obligation at any time to perform or to comply with any of its obligations to Franchisee, whether pursuant to this Agreement or otherwise, unless (i) Franchisee has fully complied with and performed all of Franchisee's obligations under this Agreement, and (ii) no event of default, or event which with the giving of notice or passage of time or both would become an event of default, exists hereunder.

## XVI. FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT

### A. Payment of Monies Owed to Franchisor

Franchisee shall pay to Franchisor, within fifteen (15) days after the effective date of termination or expiration of this Agreement, any Royalty Fees, advertising fees, payments for inventory, supplies, Equipment or any other sums owed to Franchisor or any affiliate of Franchisor, by Franchisee, which are then unpaid.

1. The parties recognize the difficulty, but not the impossibility, of calculating damages caused by the loss to Franchisor in the event this Agreement is terminated, but nevertheless recognize and agree that such damages will arise, and hereby agree to the following formula on the calculation of such damages. Upon termination of this Agreement prior to the expiration of the term hereof other than pursuant to **Section XV.A.** hereof, then in addition to all requirements of Franchisee specified in **Section XVI**, Franchisee shall also pay Franchisor, as liquidated damages and not as a penalty and in lieu of paying Franchisor for its lost monthly Royalty Fees for the period after the termination of this Agreement, an amount equal to three (3) times the average annual Royalty Fees paid or due with respect to the Franchise during the calendar year immediately prior to the termination. If the Franchise was open for business for less than a full calendar year, Franchisor shall be entitled to an amount equal to thirty-six (36) times the average monthly Royalty Fees paid or due with



DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

respect to the Franchise during each month in which the Franchise was open for business prior to termination.

2. Notwithstanding any other provision of this Agreement, if the foregoing liquidated damages formula is unenforceable or void for any reason, Franchisee shall pay Franchisor, in lieu of liquidated damages, Franchisor's lost future profits which are caused by the loss of monthly Royalty Fees. Franchisee waives any duty on the part of Franchisor to mitigate any damages caused by the loss of future franchise fees, by Franchisee breaching this Agreement, or by Franchisee causing or otherwise allowing an event of default to occur.

**B.**    **Return of Manual and Other Materials**

Franchisee further agrees that upon termination or expiration of this Agreement, he or she will immediately return to Franchisor all originals and copies of the Manual, training aids and any other materials which have been loaned or provided to Franchisee by Franchisor or any affiliate of Franchisor. Franchisee must further agree to turn over to Franchisor any other manuals, customer lists, rolodexes, records, files, instructions, correspondence and brochures, computer software, computer diskettes, and any and all other Confidential Information and Trade Secrets relating to the operation of the Restaurant in Franchisee's possession, custody, or control and all copies thereof (all of which are acknowledged to be Franchisor's sole property), and will retain no copy or record of the foregoing, excepting only Franchisee's copy of this Agreement and any correspondence between the parties hereto, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

**C.**    **Cancellation of Assumed Names and Transfer of Phone Numbers**

Franchisee further agrees that upon termination or expiration of this Agreement, that Franchisee will take such action that may be required to cancel all assumed names or equivalent registrations relating to Franchisee's use of any Proprietary Marks and to notify the telephone Franchisor and listing agencies of the termination or expiration of Franchisee's right to use any telephone number in any classified ad and any other telephone directory listings associated with the Proprietary Marks or with the Restaurant and to authorize transfer of same to Franchisor. Franchisee must acknowledge in writing that as between Franchisor and Franchisee, Franchisor has the sole rights to and interests in all telephone numbers and directory listings associated with any Proprietary Marks or the Restaurant. Franchisee must further authorize Franchisor, and thereby appoint Franchisor as its attorney in fact, to direct the telephone Franchisor and all listing agencies to transfer the number and listings to Franchisor. Should Franchisee fail or refuse to do so, the telephone Franchisor and all listing agencies may accept such direction in this Agreement as conclusive evidence of the exclusive rights of Franchisor in such telephone numbers and directory listings and its authority to direct their transfer.

**D.**    **Cease Using Proprietary Marks**

Franchisee further agrees that, upon termination or expiration of this Agreement, Franchisee shall immediately and permanently cease to use, by advertising, or any manner whatsoever, any confidential methods, procedures, and techniques associated with Franchisor and the Proprietary Marks and any proprietary marks and distinctive forms, slogans, symbols, computer formats, signs, logos or devices associated with the System. In particular, Franchisee will cease to use, without limitation, all signs, advertising materials, stationery, forms, and any other articles which display the Proprietary Marks.

Franchise Agreement

31

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**E.**     **Cease Operating Restaurant**

Franchisee agrees to immediately cease to operate the Restaurant under this Agreement, and shall not thereafter, directly or indirectly, represent itself to the public or hold itself out as a present or former Franchisee of Franchisor.

**F.**     **Customers**

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we have the unrestricted right, without paying you any legal consideration, to offer and sell, and to permit other Salsarita's franchisees to offer and sell, any products or services, to any and all customers of your Restaurant. We have the right to use information from your computer system or related reports submitted to us for such purposes, notwithstanding anything to the contrary contained in this Agreement.

**G.**     **No Confusion with Proprietary Marks**

Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business after termination or expiration of this Agreement as follows:

1.     To not to use any reproduction, counterfeit, copy or colorable imitation of the Proprietary Marks, either in connection with such other business or in the promotion thereof, which is likely to cause confusion, mistake or deception, or which is likely to dilute Franchisor's exclusive rights in and to the Proprietary Marks.

2.     To not utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor or a former association or connection with Franchisor.

3.     To take such action as may be required to cancel all fictitious or assumed name registrations relating to Franchisee's use of any of the Proprietary Marks.

4.     To notify the telephone Franchisor and all telephone directory publishers of the termination or expiration of any rights Franchisee may have to use any telephone number and any regular, classified or other telephone directory listings associated with any of the Proprietary Marks and to authorize transfer of the telephone number to Franchisor or at Franchisor's direction. Franchisee must immediately execute such instruments and take such steps as we deem necessary or appropriate to transfer and assign each such telephone number. Franchisee irrevocably appoints Franchisor's then-President as Franchisee's duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer and assign each such telephone number.

**H.**     **Continuing Obligations**

All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire.

**I.**     **Modification of Premises**

Immediately upon termination or expiration of this Agreement for any reason, Franchisee shall make such modifications for alterations to the premises of the Restaurant operated under this Agreement as may be necessary to distinguish the appearance of the premises

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

from that of other Restaurants so clearly as to prevent any possibility of confusion by the public, including, but not limited to, removing from the premises and discontinuing the use of all signs, tags, packaging, paper goods, advertising materials, fixtures, posters, décor items, forms and other materials and supplies which display any of the Proprietary Marks or any distinctive features, images, or designs associated with Franchisor, and shall make such specific additional changes to the Restaurant premises as Franchisor may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with this requirement, Franchisor shall have the right to enter upon the premises without being guilty of trespassing or any other tort for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

J.     **Franchisor's Option to Purchase**

1.     Upon the expiration or termination of this Agreement for any reason, Franchisor will have the option to purchase from Franchisee some or all of the assets used in the Restaurant ("Assets"). Franchisor may exercise its option by giving written notice to Franchisee at any time following expiration or termination up until thirty (30) days after the later of: (A) the effective date of termination or expiration; or (B) the date Franchisee ceases to operate the Restaurant. As used in this Section, "Assets" shall mean and include, without limitation, leasehold improvements, Equipment, vehicles, furnishings, fixtures, signs, supplies, inventory (non-perishable products, materials and supplies) and related items used in the Restaurant, and the real estate fee simple or the lease or sublease for the Restaurant Location. Franchisor shall be entitled to the entry of interlocutory and permanent orders of specific performance by a court of competent jurisdiction if Franchisee fails or refuses to timely meet its obligations under this Section.

2.     Franchisor shall have the unrestricted right to assign this option to purchase the Assets. Franchisor or its assignee shall be entitled to all customary representations and warranties that the Assets are free and clear (or, if not, accurate and complete disclosure) as to: (A) ownership, condition and title; (B) liens and encumbrances; (C) environmental and hazardous substances; and (D) validity of contracts and liabilities inuring to Franchisor or affecting the Assets, whether contingent or otherwise.

3.     If Franchisor only chooses to purchase inventory, supplies, Equipment and/or related items, the purchase price for these items shall be the original cost depreciated over five (5) years on a straight line basis and, if more than 5 years old, the purchase price will be ten percent (10%) of the original cost. If Franchisor chooses to purchase the Restaurant, the purchase price for the Assets ("Purchase Price") shall be their fair market value, (or, for leased assets, the fair market value of Franchisee's lease) determined as of the effective date of purchase in a manner that accounts for reasonable depreciation and condition of the Assets; provided, however, that the Purchase Price shall take into account the termination of this Agreement. Further, the Purchase Price for the Assets shall not contain any factor or increment for any trademark, service mark or other commercial symbol used in connection with the operation of the Restaurant nor any goodwill or "going concern" value for the Restaurant. Franchisor may exclude from the Assets purchased in accordance with this Section any Equipment, vehicles, furnishings, fixtures, signs, and inventory that are not approved as meeting then-current standards for a Restaurant or for which Franchisee cannot deliver a Bill of Sale in a form satisfactory to Franchisor.



4.  If Franchisor and Franchisee are unable to agree on the fair market value of the Assets within thirty (30) days after Franchisee's receipt of Franchisor's notice of its intent to exercise its option to purchase the Assets, the fair market value shall be determined by two professionally certified appraisers, Franchisee selecting one and Franchisor selecting one. If the higher appraisal is more than 10% greater than the other appraisal, the two appraisers shall select a third professionally certified appraiser who also shall appraise the fair market value of the Assets. The average value set by the appraisers (whether two or three appraisers as the case may be) shall be conclusive and shall be the Purchase Price.

5.  The appraisers shall be given full access to the Restaurant, the Restaurant Location and Franchisee's books and records during customary business hours to conduct the appraisal and shall value the leasehold improvements, equipment, furnishings, fixtures, signs and inventory in accordance with the standards of this Section. The appraisers' fees and costs shall be borne equally by Franchisor and Franchisee.

6.  Within ten (10) days after the Purchase Price has been determined, Franchisor may exercise its option to purchase the Assets by so notifying Franchisee in writing ("Franchisor's Purchase Notice"). The Purchase Price shall be paid in cash or cash equivalents at the closing of the purchase ("Closing"), which shall take place no later than sixty (60) days after the date of Franchisor's Purchase Notice. From the date of Franchisor's Purchase Notice until Closing:

7.  Franchisee shall operate the Restaurant and maintain the Assets in the usual and ordinary course of business and maintain in full force all insurance policies required under this Agreement. Franchisor shall have the right to appoint a manager, at Franchisor's expense, to control the day-to-day operations of the Restaurant and Franchisee shall cooperate, and instruct its employees to cooperate, with the manager appointed by Franchisor. Alternatively, Franchisor may require Franchisee to close the Restaurant during such time period without removing any Assets from the Restaurant.

8.  For a period of thirty (30) days after the date of Franchisor's Purchase Notice ("Due Diligence Period"), Franchisor shall have the right to conduct such investigations as it seems necessary and appropriate to determine: (A) the ownership, condition and title of the Assets; (B) liens and encumbrances on the Assets; (C) environmental and hazardous substances at or upon the Restaurant Location; and (D) the validity of contracts and liabilities inuring to Franchisor or affecting the Assets, whether contingent or otherwise. Franchisee will afford Franchisor and its representatives access to the Restaurant and the Restaurant Location at all reasonable times for the purpose of conducting inspections of the Assets; provided that such access does not unreasonably interfere with Franchisee's operations of the Restaurant.

9.  During the Due Diligence Period, at its sole option and expense, Franchisor may (A) cause the title to the Assets that consist of real estate interests ("Real Estate Assets") to be examined by a nationally recognized title company and conduct lien searches as to the other Assets; (B) procure "AS BUILT" surveys of the Real Estate Assets; (C) procure environmental assessments and testing with respect to the Real Estate Assets; and/or (D) inspect the Assets that consist of leasehold improvements, equipment, vehicles, furnishings, fixtures, signs and inventory ("Fixed Assets") to determine if the Fixed Assets are in satisfactory working condition. Prior to the end of the Due Diligence Period, Franchisor shall notify Franchisee in writing of any objections that Franchisor has to any finding disclosed in any title to lien search,



Franchise Agreement

34

04/12

survey, environmental assessment or inspection. If Franchisee cannot or elects not to correct any such title defect, environmental objection or defect in the working condition of the Fixed Assets, Franchisor will have the option to either accept the condition of the Assets as they exist or rescind its option to purchase on or before the Closing.

10. Prior to the Closing, Franchisee and Franchisor shall comply with all applicable legal requirements, including the bulk sales provisions of the Uniform Commercial Code of the state in which the Restaurant is located and the bulk sales provisions of any applicable tax laws and regulations. Franchisee shall, prior to or simultaneously with the Closing, pay all tax liabilities incurred in connection with the operation of the Restaurant prior to Closing. Franchisor shall have the right to set off against and reduce the Purchase Price by any and all amounts owed by Franchisee to Franchisor, and the amount of any encumbrances or liens against the Assets or any obligations assumed by Franchisor.

11. If the Restaurant Location is leased, Franchisor agrees to use reasonable efforts to effect a termination of the existing lease for the Restaurant Location. If the lease for the Restaurant Location is assigned to Franchisor or Franchisor subleases the Restaurant Location from Franchisee, Franchisor will indemnify and hold Franchisee harmless from any ongoing liability under the lease from the date Franchisor assumes possession of the Restaurant Location, and Franchisee will indemnify and hold Franchisor harmless from any liability under the lease prior to and including that date.

12. If Franchisee owns the Restaurant Location, Franchisor, at its option, will either purchase the fee simple interest or, upon purchase of the other Assets, enter into a standard lease with Franchisee on terms comparable to those for which similar commercial properties in the area are then being leased. The initial term of this lease with Franchisee shall be at least 10 years with 4 options to renew of 5 years each and the rent shall be the fair market rental value of the Restaurant Location. If Franchisee and Franchisor cannot agree on the fair market rental value of the Restaurant Location, then appraisers (selected in the manner described in this Section) shall determine the rental value.

13. At the Closing, Franchisee shall deliver instruments transferring to Franchisor or its assignee: (A) good and merchantable title to the Assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to Franchisor or its assignee), with all sales and other transfer taxes paid by the Franchisee; (B) all licenses and permits for the Restaurant that may be assigned or transferred, with appropriate consents, if required; and (C) the lease or sublease for the Restaurant Location, with appropriate consents, if required. If Franchisee cannot deliver clear title to all of the purchased Assets as indicated in this Section, or if there are other unresolved issues, the Closing shall be accomplished through an escrow.

## XVII. RELATIONSHIP OF FRANCHISOR AND FRANCHISEE

### A. Independent Contractors

Franchisor and Franchisee are independent contractors. Neither this Agreement, the nature of the relationship of the parties nor the dealings of the parties pursuant to this Agreement will create, directly or indirectly, any fiduciary or similar relationship between the parties

hereto. Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. Franchisee agrees to conspicuously identify itself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Franchise and business and agree to place such other notices of independent ownership at your Franchise and on forms, business cards, stationery, advertising and other materials as Franchisor may require from time to time.

Franchisee may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in Franchisor's name or on its behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. Franchisor will not be obligated by or have any liability under any agreements made by Franchisee with any third party or for any representations made by Franchisee to any third party. Franchisor will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of the Franchise.

**B.**      **Indemnification**

Franchisee agrees to indemnify Franchisor and its affiliates and the respective directors, officers, employees, shareholders, agents, successors and assigns of Franchisor and its affiliates (collectively, **"indemnitees"**), and to hold the indemnitees harmless to the fullest extent permitted by law, from any and all losses and expenses (as defined below) incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, or as a result of, a claim of a third party in connection with the selection, development, ownership, operation or closing of the Franchise (collectively, an **"event"**), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the indemnitees, provided, however, that this indemnity will not apply to any liability arising from a breach of this Agreement by the indemnitees or the gross negligence or willful acts of indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein will extend to any finding of comparative or contributory negligence attributable to Franchisee). The term **"losses and expenses"** includes compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses. Franchisee agrees to give Franchisor prompt notice of any event of which you are aware for which indemnification is required, and, at your expense and risk, we may elect to assume (but under no circumstance obligated to undertake) the defense and/or settlement thereof, provided that we will seek Franchisee's advice and counsel. Franchisor's assumption of the defense does not modify Franchisee's indemnification obligation. Franchisor may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in Franchisor's reasonable discretion, necessary for the protection of the indemnitees or the System generally. This **Section XVII.B.** will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

**C.**      **No Fiduciary Relationship**

It is understood and agreed by and between Franchisor and Franchisee that this Agreement does not establish a fiduciary relationship between them in any manner.


Franchise Agreement

04/12

## XVIII.    COVENANTS

### A.    Franchisee Receives Confidential Information

Franchisee specifically acknowledges that pursuant to this Agreement, Franchisee will receive valuable training and confidential information, including, without limitation, Confidential Information, Trade Secrets, information regarding promotional, operational, sales, and marketing methods and techniques of Franchisor and the System.

### B.    Competitive Business

"**Competitive Business**" means any business enterprise which operates a restaurant specializing in quick serve Mexican food and beverages, or any other business that is the same as, or similar to, the Franchise, as such may evolve over time. Franchisor would be unable to protect its Trade Secrets and Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among its franchisees if such franchisees were permitted an unrestricted right to hold interests in, or perform services for, any Competitive Business. During the term of this Agreement, and for a period of one year following the expiration or termination of this Agreement, neither Franchisee nor any Owner (if applicable) nor any member of his, her or their immediate families (whether natural or adopted), shall hold interests in, or perform services for a Competitive Business without Franchisor's prior review and written consent.

### C.    Covenant Not to Compete

Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not: (1) during the term of this Agreement either directly or indirectly, including but not limited to through any member of his, her or their immediate families (whether natural or adopted), for himself, or on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in, any retail business specializing, in whole or in part, in a Competitive Business offering to the public products and/or services which are substantially similar to the products and/or services then offered by Restaurants a Competitive Business; (2) for two (2) years after expiration or termination of this Agreement, regardless of the reason for such termination or expiration, either directly or indirectly, including but not limited to through any member of his, her or their immediate families (whether natural or adopted), for himself, or on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in, any retail business specializing, in whole or in part, in a Competitive Business offering to the public products and/or services which are substantially similar to the products and/or services then offered by Restaurants (a) from the Franchise or within the area defined in **Exhibit C** or (b) a two-mile radius of any other Restaurant; and (3) either directly or indirectly, including but not limited to, through any member of his, her or their immediate families (whether natural or adopted) for himself, or on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in any business granting franchises or licenses to others to operate a location principally offering products or services in a manner substantially similar to Franchisor. The radius of the restrictive covenant set forth in this **Section XVIII.C.** shall be a radius measured with the main entrance door of the Franchise at the center of that radius with respect to the measurement from the Franchise, and measured with the main entrance door of another Restaurant at the center of the radius with respect to measurement from another Restaurant. This covenant is not intended to prevent any individual Franchisee from being able to procure gainful employment Franchisee acknowledges and agrees the above stated covenant



Franchise Agreement

37

04/12

not to compete is reasonable and necessary for the protection of all Salsarita's franchisees and the System. The two (2) year post-term covenant not to compete shall be tolled during any period time Franchisee is in violation of such post-term covenant not to compete such that the covenant not to compete shall be enforceable for a full two (2)-year period.

**D.** **Exception to Covenant Not to Compete**

**Section XVIII.C.** hereof shall not apply to ownership by Franchisee of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

**E.** **Covenants are Independent**

The parties agree that each of the foregoing covenants shall be construed to be independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this section of this Agreement are held to be unenforceable or unreasonable by a court or agency having competent jurisdiction in any final decision to which Franchisor is a party, Franchisee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resultant covenant were separately stated in and made a part of this section of this Agreement.

**F.** **Claims Are Not Defense to Covenants**

Franchisee expressly agrees that the existence of any claim it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants of this section of this Agreement. Franchisee further agrees that Franchisor shall be entitled to set off from any amount owed by Franchisor to Franchisee any loss or damage to Franchisor resulting from Franchisee's breach of this section of this Agreement.

**G.** **Injunctive Relief Available to Franchisor**

Franchisee acknowledges that any failure to comply with the requirements of this section of this Agreement will cause Franchisor irreparable injury for which no adequate remedy at law may be available, and Franchisee hereby accordingly consents to the issuance by a court of competent jurisdiction of an injunction prohibiting any conduct by Franchisee in violation of the terms of this section of this Agreement. Franchisor may further avail itself of any legal or equitable rights and remedies which it may have under this Agreement or otherwise. Franchisee agrees that notwithstanding the requirements regarding dispute resolution as set forth in **Section XXII.A.**, Franchisor, due to the nature of the irreparable harm and injury Franchisor and the System will suffer if the requirements of this section of this Agreement are violated, may apply for injunctive relief to a state or federal court of competent jurisdiction located in Mecklenburg County, North Carolina, or the Western District of North Carolina, and Franchisee hereby consents to personal jurisdiction and venue in such courts.

**H.** **Business Entity Franchisee**

If Franchisee is a business entity, the following requirements shall apply:

1. Franchisee has furnished to Franchisor a complete and accurate list of all Owners. Franchisee will maintain a current list of all Owners and their percentage ownership interest (as set forth in Exhibit A). Franchisee will comply with this Section prior to any change in ownership interests and will execute addenda to Exhibit A as changes

occur in order to ensure the information contained in Exhibit A is true, accurate and complete at all times.

2. Franchisee shall cause each Owner to guarantee Franchisee's performance hereunder and to perform and discharge certain obligations under this Agreement by entering into the Payment and Performance Guarantee attached hereto. Franchisee hereby represents that Owners are the only persons that hold an equity interest in Franchisee.

## XIX. ASSIGNMENT

### A.  Assignment by Franchisor

This Agreement grants Franchisor the right to freely transfer or assign all or part of its rights or obligations under this Agreement to any assignee or other legal successor to the interests of Franchisor without Franchisee's consent.

### B.  Assignment by Franchisee

1. This Agreement and the License are personal to Franchisee and, if Franchisee is a business entity, Franchisee's owners ("**Owners**"), and Franchisor has granted the License in reliance on the business skill, financial capacity and personal character of Franchisee and Owners. Accordingly, except as otherwise provided herein, neither Franchisee nor any successor to any part of Franchisee's interest in this Agreement or the License nor any Owner may make any Transfer or permit any Transfer to occur without obtaining Franchisor's prior written consent. Any purported Transfer, without the prior written consent of Franchisor, shall be null and void and shall constitute a material breach of this Agreement. For purposes of this **Section XIX.B., "Transfer"** means any sale, assignment, transfer, conveyance, give away, pledge, mortgage or other encumbrance, either voluntarily or by operation of law (such as through divorce or bankruptcy proceedings) of any interest in Franchisee (if Franchisee is a business entity), this Agreement, the License, the Franchise or any other assets relating to Franchisee's operations under this Agreement.

2. Franchisor shall not unreasonably withhold its consent to a Transfer. The decision as to whether or not to consent to a proposed Transfer shall be made by Franchisor in its sole discretion and shall include numerous factors deemed relevant by Franchisor. These factors may include, but will not be limited to, the following:

    a. transferee demonstrates to Franchisor's satisfaction that it or its owners meet Franchisor's educational, financial, managerial and business standards; possess a good moral character, business reputation and credit rating; have the aptitude and ability to operate the Franchise; have adequate financial resources and capital to manage the Franchise; and are not engaged in, and have no affiliation with any person engaged in, a competing business;

    b. Franchisee agrees to remain liable for all of the obligations to Franchisor in connection with the Franchise arising prior to the effective date of the Transfer, and execute any and all instruments reasonably requested by Franchisor to evidence such liability;

 Franchise Agreement

39

04/12

    c.    transferee signs the then current form of this Agreement, which form may contain provisions which materially alter the rights or obligations of Franchisee under this Agreement; and

    d.    all of Franchisee's accrued monetary obligations to Franchisor are satisfied.

Franchisor shall not charge such assignee an Initial Franchise Fee for the Franchise, but will charge a transfer fee equal to (a) thirty percent (30%) of the then-current Initial Franchise Fee charged by Franchisor in its then-current Franchise Agreement plus the amount of any training fees if the transferee is an existing franchisee or controlled by one or more Owners of any existing franchisee or (b) one hundred percent (100%) of the then-current Initial Franchise Fee charged by Franchisor in its then-current Franchise Agreement if the transferee is not an existing franchisee or controlled by one or more Owners of any existing franchisee. Notwithstanding the foregoing, neither Franchisee nor transferee will be required to pay Franchisor a transfer fee in connection with a Transfer of less than 50% of the ownership interests in Franchisee, including, but not limited to, a Transfer subject to Section XIX.B.3. If Franchisor determines that training is required, at its own expense assignee will attend training at Franchisor's training center as required under the then current Franchise Agreement. Franchisor shall have the right to require Franchisee (and Owners) to execute a general release of Franchisor in a form satisfactory to Franchisor's counsel as a condition to its approval of assignment or other transfer of the Franchise.

    3.    Notwithstanding the foregoing, if Franchisee is a business entity, Franchisor will consent to the Transfer of 10% or less of the ownership interests in Franchisee, provided that: **(a)** Franchisee provides Franchisor prior written notice of the proposed Transfer; **(b)** Franchisee and/or the transferee (as applicable) comply with the requirements of Section XVIII.H; and **(c)** after the Transfer, those persons or entities that have an ownership interest in Franchisee as of the Effective Date have at least a 49% direct equity interest in Franchisee.

**C.**    <u>Franchisor's Right of First Refusal</u>

If any party holding any interest in Franchisee or in this Agreement receives a bona fide offer (as determined by Franchisor in its reasonable discretion) from a third party or otherwise desires to undertake any Transfer that would require Franchisor's consent, such offer shall be submitted to Franchisor. For a period of thirty (30) days from the date of Franchisor's or the Owners' receipt of such offer, Franchisor shall have the right, exercisable by written notice to Franchisee (or Owners), to purchase the Restaurant or such ownership, for the price and on the same terms and conditions contained in such offer, provided that Franchisor may substitute cash for any other form of payment proposed in such offer. If Franchisor does not exercise its right of first refusal, the bona fide written offer may be accepted by Franchisee (or Owners) but only upon the same terms and conditions proposed to Franchisor, and subject to the prior written approval of Franchisor, as provided in this Agreement.

**D.**    <u>Transfer Upon Death or Mental Incapacity</u>

Upon the death or mental incapacity of any person with an interest in the Franchise, the executor, administrator, or personal representative of that person must Transfer his or her interest to a third party approved by Franchisor within three (3) months after death or mental incapacity. These Transfers, including, without limitation, Transfers by devise or inheritance, will be subject to the same restrictions and conditions as any inter vivos Transfer. However, in the case of a Transfer by devise or inheritance, if the heirs or



DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee shall have a reasonable time in the sole discretion of Franchisor, to dispose of the deceased's interest in the Restaurant which disposition will be subject to all the terms and conditions for Transfer contained in this Agreement. If the interest is not disposed of within a reasonable time (as determined by Franchisor in its sole discretion), Franchisor may terminate this Agreement.

## XX. OPERATION IN THE EVENT OF ABSENCE, INCAPACITY OR DEATH

In order to prevent any interruption of the business of the Restaurant which would cause harm to said business and thereby depreciate the value thereof, Franchisee authorizes Franchisor, in the event that Franchisee is absent or incapacitated or dies, and is not, therefore, in the sole judgment of Franchisor, able to operate the Restaurant hereunder, to operate said business for so long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor may have under this Agreement. Provided, however, that in the event that Franchisor should commence to operate the Franchise, Franchisor shall not be obligated to so operate the Franchise for a period of more than ninety (90) days. All monies from the operation of the business during such period of operation by Franchisor shall be kept in a separate account and the expenses of the business, including reasonable compensation and expenses for Franchisor's representatives, shall be charged to said account. If, as herein provided, Franchisor temporarily operates the Restaurant, Franchisee agrees to indemnify and hold harmless Franchisor and any representative of Franchisor who may act hereunder, from any and all claims arising from the acts and omissions of Franchisor and its representative arising therefrom.

## XXI. WAIVER

No failure of Franchisor to exercise any power reserved to it by this Agreement or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. Waiver by Franchisor of any particular default or breach by Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default or breach of the same, similar or different nature; nor shall any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's right to exercise the same; nor shall such constitute a waiver by Franchisor of any succeeding breach by Franchisee of any terms, covenants or conditions of this Agreement. Following a notice of default or termination to Franchisee, the acceptance by Franchisor of any monies from Franchisee which do not fully cure any such monetary fault within the time provided shall not be deemed a waiver of Franchisor's right to effectuate termination of this Agreement and Franchisee's rights hereunder.

## XXII. ENFORCEMENT

### A. Governing Law

This Agreement and any claim or controversy arising out of, or relating to, rights and obligations of the parties under this Agreement and any other claim or controversy between the parties shall be governed by and construed in accordance with the laws of the State of North Carolina without regard to conflicts of laws principles. Nothing in this Section is intended, or shall be deemed, to make any North Carolina law regulating the offer or sale of franchises or the franchise relationship applicable to this Agreement if such law would not otherwise be applicable.



Franchise Agreement

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 67 of 100

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**B.**   **Forum**

The parties agree that, to the extent any disputes cannot be resolved directly between them, Franchisee shall file any suit against Franchisor only in the federal or state court having jurisdiction where Franchisor's principal offices are located at the time suit is filed. Franchisor may file suit in the federal or state court located in the jurisdiction where its principal offices are located at the time suit is filed or in the jurisdiction where Franchisee resides or does business or where the Restaurant is or was located or where the claim arose. Franchisee consents to the personal jurisdiction of those courts over Franchisee and to venue in those courts.

**C.**   **Limitations**

Except for payments owed by one party to the other, and unless prohibited by applicable law, any legal action or proceeding (including the offer and sale of a franchise to Franchisee) brought or instituted with respect to any dispute arising from or related to this Agreement or with respect to any breach of the terms of this Agreement must be brought or instituted within a period of two (2) years after the initial occurrence of any act or omission that is the basis of the legal action or proceeding, whenever discovered.

**D.**   **Waivers**

Franchisee and Franchisor waive, to the fullest extent permitted by law, any right or claim of any punitive or exemplary damages against each other and agree that, in the event of a dispute between them, each shall be limited to the recovery of actual damages sustained by it. **Franchisee and Franchisor waive, to the fullest extent permitted by law, the right to bring, or be a class member in, any class action suits and the right to trial by jury.**

**E.**   **Attorneys' Fees**

If either party brings an action to enforce this Agreement in a judicial proceeding, the party prevailing in that proceeding shall be entitled to reimbursement of costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, the cost of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of, the proceeding. If Franchisor utilizes legal counsel (including in-house counsel employed by Franchisor) in connection with any failure by Franchisee to comply with this Agreement, Franchisee shall reimburse Franchisor for any of the above-listed costs and expenses incurred by Franchisor. In any judicial proceeding, the amount of these costs and expenses will be determined by the court and not by a jury.

**F.**   **Severability and Substitution of Valid Provisions**

All provisions of this Agreement are severable, and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and any partially valid and enforceable provisions shall be enforced to the extent valid and enforceable. If any applicable law or rule requires a greater prior notice of the termination of this Agreement than is required hereunder, or requires the taking of some other action not required hereunder, the prior notice or other action required by such law or rule shall be substituted for the notice or other requirements hereof.

Franchise Agreement

42

04/12

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 68 of 100

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**G.**     **Franchisee May Not Withhold Payments Due Franchisor**

Franchisee agrees that he or she will not withhold payments of any Royalty Fees or any other amounts of money owed to Franchisor for any reason on grounds of alleged nonperformance by Franchisor of any obligation hereunder.

**H.**     **Rights of Parties Are Cumulative**

The rights of Franchisor and Franchisee hereunder are cumulative, and the exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder shall not preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder which Franchisor or Franchisee is entitled by law or equity to enforce. Nothing herein shall preclude Franchisor from seeking consequential damages (including, without limitation, lost profits) in the event that Franchisee terminates this Agreement without complying with **Section XV.A.** or Franchisor terminates this Agreement due to Franchisee's breach or default.

**I.**     **Binding Effect**

This Agreement is binding upon the parties hereto and their respective permitted assigns and successors in interest.

**J.**     **Construction**

The headings of the several sections and paragraphs hereof are for convenience only and do not define, limit, or construe the contents of those sections or paragraphs. The term **"Franchisee"** as used herein is applicable to one or more persons or an entity, as the case may be; the singular usage includes the plural; and the masculine and neuter usages include the other and feminine. The language of this Agreement will be construed according to its fair meaning and not strictly against or for any party. If there is an inconsistency between the terms of this Agreement and the Manual, the terms of this Agreement will prevail. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than our franchise disclosure document, that either party may or does rely on or that will have any force or effect. This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement will be deemed to confer any rights or remedies on any person or legal entity not a party hereto, other than successors and assigns of any party to this Agreement whose interests are assigned in accordance with its terms.

The headings of articles and sections are for convenience only and do not limit or construe their contents. The word "including" will be construed to include the words "without limitation." If two or more persons are at any time Franchisee hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to us will be joint and several. The parties hereto acknowledge and agree that the franchise relationship contemplated by this Agreement, as well as other similar agreements with other Salsarita's franchisees, confers on Franchisor the discretion to make decisions and to take certain actions and that Franchisor will exercise its business judgment honestly in doing so.

Whenever this Agreement requires the approval or consent of either party, the other party must make written request therefor, and such approval or consent must be obtained in writing. This Agreement may be executed in multiple copies, each of which will be deemed an original. Time is of the essence in this Agreement.

69

Case 3:22-cv-00206-FDW-DSC   Document 52   Filed 11/17/22   Page 69 of 100

**K.**      <u>Modification</u>

This instrument contains the entire agreement between the parties relating to the subject matter hereof. Any oral representations or modifications concerning this Agreement shall be of no force or effect unless a subsequent modification in writing is signed by the parties hereto.

**L.**      <u>Exercise of Rights</u>

Except as otherwise expressly provided herein, the rights of the parties hereto are cumulative and no exercise or enforcement by either party of any right or remedy hereunder will preclude the exercise or enforcement of any other right or remedy which such party is entitled to enforce by law. Notwithstanding the foregoing, nothing in this Agreement is intended to disclaim any representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to Franchisee.

**M.**      <u>Notices and Payments</u>

All notices, requests and reports permitted or required to be delivered by this Agreement will be deemed delivered: (a) at the time delivered by hand to the recipient party (or to an officer, director, member, manager or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) one business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) five (5) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement must be sent to us at the address identified in this Agreement unless and until a different address has been designated by written notice.

**XXIII.**      <u>TAXES, PERMITS AND INDEBTEDNESS</u>

**A.**      <u>Franchisee Must Pay Taxes Promptly</u>

Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, payroll, unemployment and sales taxes, and shall promptly pay when due all accounts and other indebtedness of any kind incurred by Franchisee in the conduct of the Restaurant's business, including but not limited to amounts due to Franchisee's lessors, vendors and creditors.

Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax or similar tax imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**B.**      <u>Franchisee Can Contest Tax Assessments</u>

In the event of any bona fide dispute as to any liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the proper procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar liens, writ or warrant, or attachment by a creditor to occur against the premises of the Restaurant or any improvements thereon.

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

### C. Franchisee Must Comply With Laws

Franchisee shall, at Franchisee's expense, comply with all federal, state and local laws, rules, regulations and ordinances and shall timely obtain and shall keep in force as required throughout the term of this Agreement all permits, certificates and licenses necessary for the full and proper conduct of the Restaurant, including, without limitation, any required permits, licenses to do business, fictitious name filings and registrations, sales tax permits, health inspections and fire clearances.

### D. Franchisee Must Notify Franchisor of Lawsuits

Franchisee shall notify Franchisor in writing within five (5) days of notice of the commencement of, or against the threat of, any action, suit, or proceeding by or against Franchisee, and of the issuance of, or against the threat of, any inquiry, subpoena, order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which arises out of, concerns, or may affect the operation or financial condition of Restaurant, including, without limitation, any criminal action or proceedings brought by Franchisee against its employees, customers, or other persons.

### E. Franchisee Authorizes Franchisor to Contact Lessors, Vendors and Creditors

Franchisee hereby authorizes Franchisor to contact Franchisee's lessors, vendors and creditors as Franchisor deems appropriate to address compliance and other issues related to the Restaurant and this Agreement, and Franchisee agrees that such lessors, vendors and creditors are authorized to disclose factual information regarding Franchisee's contracts, debts and other obligations to Franchisor.

## XXIV. RESTRICTIONS ON GOODS AND SERVICES OFFERED BY FRANCHISEE

This Agreement provides that Franchisee may not be associated either directly or indirectly with a business competitive with the Restaurant within a certain geographic area. Further, Franchisee may only provide such products and services at the Restaurant as are permitted by Franchisor. Franchisee is not limited as to the customers to whom it may sell the products and services authorized by Franchisor.

A Franchisee may not offer for sale at the Franchise hereunder any products or services not authorized by Franchisor; sell any products from any location other than his or her Restaurant; and may not use his or her Restaurant for any other purpose than the operation of the Restaurant.

The Franchisor, from time to time, may conduct market research and testing to determine the viability of new products and services. A Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products, if required by Franchisor.

## XXV. VARYING STANDARDS

Because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its sole and absolute discretion and as it may deem in the best interests of all concerned in any specific instance, to vary standards and franchise agreement provisions for any Franchisee or prospective Franchisee based upon the peculiarities of a particular site or circumstance, density of population, business potential, population or trade area, existing business practices, or any other condition which Franchisor deems to be of importance to the successful operation of such Franchisee's business. Franchisee shall not have any right to complain about a variation from standard specifications and practices

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

granted to any other Franchisee and shall not be entitled to require Franchisor to grant to Franchisee a like or similar variation.

### XXVI.    AUTHORITY

Franchisee has caused all Owners to read and approve this Agreement, including any restrictions which this Agreement places upon their right to transfer their Equity Securities.

### XXVII. AUTHORIZED OFFICERS.

Except for those officers specifically named on **Exhibit D** hereto, no other person or entity is authorized to act on behalf of Franchisee with respect to any right or obligation of Franchisee under this Agreement or other similar agreement between Franchisee and Franchisor. Franchisee agrees to update the authorized persons set forth on **Exhibit D** promptly following the cessation of such persons' authorization to act on behalf of Franchisee.

### XXVIII.  SPECIAL REPRESENTATIONS

Franchisee (and each Owner if Franchisee is a business entity) hereby represents that:

A.    Franchisee has received (i) Franchisor's then current franchise disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least fourteen (14) days prior to execution as required by such Trade Regulation Rule and (ii) a fully completed copy of this Agreement at least seven (7) days prior to execution as required by such Trade Regulation Rule.

B.    Neither Franchisee, nor any Owner, nor any of their respective affiliates is identified, either by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (texts currently available at www.treas.gov/offices/enforcement/ ofac/). Further, Franchisee represents and warrants that neither it nor any Owner of their respective affiliates referred to above has violated, and Franchisee agrees not to violate and to cause each of them to refrain from violating, any law prohibiting corrupt business practices, money laundering or the aid or support of entities or individuals who conspire to commit acts of terror against any entity, individual or government, including acts prohibited by the U.S. Patriot Act (text currently available at http://www.epic.org/privacy/terrorism/ hr3162.html), U.S. Executive Order 13224 (text currently available at http://www.treas.gov/offices/ enforcement/ofac/legal/eo/13224.pdf), or any similar law. The foregoing constitute continuing representations and warranties, and Franchisee shall immediately notify Franchisor in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties false, inaccurate or misleading.

C.    Franchisee has conducted an independent investigation of Franchisor's business and System and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent business person. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business contemplated by this Agreement.

D.    Franchisee has received, read, and understood this Agreement, including all Attachments hereto; and that Franchisor has accorded Franchisee ample time and opportunity to consult



DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

with advisors of his/her own choosing about the potential benefits and risks of entering into this Agreement.

E.  Prior to the date of this Agreement, no other Agreement was entered into, no promises were made by Franchisor, that Franchisee has relied upon no representations other than those set forth in this Agreement and Franchisor's franchise disclosure document, and that no funds were offered to or accepted by Franchisor prior to execution of this Agreement and only in accordance with this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement as of the Effective Date.

**FRANCHISOR:**

**SALSARITA'S FRANCHISING, LLC**

By: _____

Print Name: _____ Larry J. Reinstein _____

Title: _____ President & COO _____

**FRANCHISEE:**

**GIBSON FAMILY ENTERPRISES, LLC**

By: _____

Print Name: _____ Bill Gibson _____

Title: _____ Member _____

Franchise Agreement

47

04/12

## Payment and Performance Guarantee

In order to induce **SALSARITA'S FRANCHISING, LLC** (**"Franchisor"**) to enter into a certain Franchise Agreement (the **"Franchise Agreement"**) by and between Franchisor and the Franchisee named in the Franchise Agreement to which this Payment and Performance Guarantee (the **"Guarantee"**) is attached, the undersigned (collectively referred to as the **"Guarantors"** and individually referred to as a **"Guarantor"**) hereby covenant and agree as follows:

1.    <u>Guarantee of Payment and Performance</u>.    The Guarantors jointly, severally and unconditionally guarantee to Franchisor and its affiliates the payment and performance when due, whether by acceleration or otherwise, of all obligations, indebtedness and liabilities of Franchisee to Franchisor, direct or indirect, absolute or contingent, of every kind and nature, whether now existing or incurred from time to time hereafter, whether incurred pursuant to the Franchise Agreement or otherwise, together with any extension, renewal or modification thereof in whole or in part (the **"Guaranteed Liabilities"**), and agree that if any of the Guaranteed Liabilities is not so paid or performed by Franchisee when due, the Guarantors will immediately do so.   The Guarantors further agree to pay all expenses (including reasonable attorneys' fees) paid or incurred in endeavoring to enforce this Guarantee or the payment of any Guaranteed Liabilities.

2.    <u>Waivers by Guarantors</u>. The Guarantors waive presentment, demand, notice of dishonor, protest and all other notices whatsoever, including without limitation notices of acceptance hereof, of the existence or creation of any Guaranteed Liabilities, of the amounts and terms thereof, of all defaults, disputes or controversies between Franchisor and Franchisee and of the settlement, compromise or adjustment thereof.  This Guarantee is primary and not secondary, and shall be enforceable without Franchisor having to proceed first against Franchisee or against any or all of the Guarantors or against any other security for the Guaranteed Liabilities.  This Guarantee shall be effective regardless of the insolvency of Franchisee by operation of law, any reorganization, merger or consolidation of Franchisee, or any change in the ownership of Franchisee.

3.    <u>Term; No Waiver</u>.  This Guarantee shall be irrevocable, absolute and unconditional and shall remain in full force and effect as to each of the Guarantors until such time as all Guaranteed Liabilities of Franchisee to Franchisor and its affiliates have been paid and satisfied in full.  No delay or failure on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Franchisor of any right or remedy shall preclude other further exercise of such right or any other right or remedy.

4.    <u>Other Covenants</u>.  Each of the Guarantors agrees to comply with the provisions of **Sections XI, XII, XVII.B., XVIII** and **XIX** of the Franchise Agreement as though he or she were the "Franchisee" named therein and agrees that he or she shall take any and all actions as may be necessary or appropriate to cause Franchisee to comply with the Franchise Agreement and shall not take any action that would cause Franchisee to be in breach of the Franchise Agreement.

5.    <u>Enforcement</u>.  **Section XXII** of the Franchise Agreement is incorporated herein by reference and shall be applicable to any all disputes between Franchisor and any of the Guarantors, as though Guarantor were the "Franchisee" referred to therein. This consent, being coupled with an interest, shall survive the death, dissolution or any other incapacity of each of the Guarantors.

6.    <u>Miscellaneous</u>.  This Agreement shall be binding upon the Guarantors and their respective heirs, executors, successors and assigns, and shall inure to the benefit of Franchisor and its successors and assigns.

 Franchise Agreement                                                                                           04/12

74

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

IN WITNESS WHEREOF, the undersigned Guarantors have caused this Guarantee to be duly executed as of the day and year first above written.

By: _____

Print Name:   Bill E. Gibson

By: _____

Print Name:   Holli R. Gibson

Franchise Agreement

2

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**EXHIBIT A**
**TO FRANCHISE AGREEMENT**

<u>General Information</u>

Effective Date:                                            <u>April 10, 2013</u>

Franchisor's Principal Business Address:         Salsarita's Franchising, LLC
                                                              2908 Oak Lake Blvd Suite 205
                                                         Charlotte, North Carolina 28208
                                                         Facsimile No.: <u>704-329-1718</u>
                                                         Attention: Franchise Administration

Franchisee's Name:                                   <u>GIBSON FAMILY ENTERPRISES, LLC</u>

INITIAL FRANCHISE FEE:                            <u>$30,000</u>

Owners:

| Name | Percentage Ownership Interest |
|------|-------------------------------|
| Bill E. Gibson | 50% |
| Holli R. Gibson | 50% |
|  |  |
|  |  |

Operating Principal:                                   <u>George Jackson</u>

Franchisee's State of Organization (if applicable):   <u>Kentucky</u>

Advertising Obligation: Franchisee's Advertising Obligation shall be allocated as set forth below, unless and until modified by Franchisor:

    A.    Creative Fund             <u>1</u> % of Net Revenues

    B.    Regional Co-op          <u>0</u> % of Net Revenues

    C.    National Ad Fund        <u>0</u> % of Net Revenues

    D.    Local Store Marketing Fund    <u>1.5</u> % of Net Revenues

**TOTAL ADVERTISING OBLIGATION:**    <u>2.5</u> % of Net Revenues

 Franchise Agreement

04/12

76

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Address and facsimile number of Franchisee:

2126 Wyndamere Lane
Paris, Kentucky 40361

Address and facsimile number of Guarantor(s):

Bill & Holli Gibson
2126 Wyndamere Lane
Paris, Kentucky 40361

(Sections below to be competed once location is approved)

Protected Territory: _____ 3 miles _____

Accepted and agreed as of _6 22_, 2013:

Franchisee _____ (initial)

Franchisor _____ (initial)

Designated Location: ___2830 Norman Ln Lexington Ky 40503___

Franchisor and Franchisee agree that the Designated Location was inserted as of _6/21/14_.

Franchise Agreement

2

04/12

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**EXHIBIT B**
**TO FRANCHISE AGREEMENT**

The Proprietary Marks

| Registration Number | Description of Mark | Principal/ Supplemental Register | Registration Date |
|---|---|---|---|
| 3,009,919 | Salsarita's Fresh Cantina | Principal | November 1, 2005 |
| 2,466,514 | Salsarita's (typed) | Principal | July 3, 2001 |
| 2,472,250 | Salsarita's (stylized) | Principal | July 24, 2001 |

| Application Number | Description of Mark | Principal/ Supplemental Register | Application Date |
|---|---|---|---|
| 85,432,057 | Salsarita's Fresh Cantina (stylized/design) | Principal | September 26, 2011 |
| 85,432,135 | Salsarita's (typed) | Principal | March 6, 2012 |



Franchise Agreement

04/12

78

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

**EXHIBIT C**
**TO FRANCHISE AGREEMENT**

<u>Restrictive Covenant Territory</u>

Three mile radius of Designated Location specified in Exhibit A.

 Franchise Agreement                                                                04/12

**EXHIBIT D**
**TO FRANCHISE AGREEMENT**

Certificate of Authorized Officers

The undersigned officer or officers, all duly appointed, qualified and acting officers of Franchisee, hereby do certify to Franchisor that the persons named below are: (1) the duly appointed or elected officers in the offices of Franchisee set forth opposite their respective names and (2) are authorized to act on behalf of Franchisee with respect to any right or obligation of Franchisee under this Franchise Agreement, Area Development Agreement, Area Representative Agreement or other similar agreement between Franchisee and Franchisor:

| Name | Title | Signature |
|------|-------|-----------|
| Bill E. Gibson | Chief Executive Member | _(signature)_ |
| Holli R. Gibson | Member | _(signature)_ |
| | | |

*(Please attach additional signature sheets if more space is required.)*

I, the undersigned, agree to update this Certificate if any information contained herein is no longer accurate.

Date: 4-11-13

_(signature)_                                    _(signature)_

Print Name: Bill E. Gibson          Print Name: Holli R. Gibson

Title: Chief Executive Member      Title: Member

80

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT B

15

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# DE-IDENTIFICATION CHECKLIST

Franchisee / Company Name: Gibson Family Enterprises, LLC
Store No. 141
Lexington, KY

This De-Identification Checklist is incorporated by reference into the Confidential Settlement Agreement entered into between Salsarita's Franchising, LLC, on the one hand, and Gibson Family Enterprises, LLC ("GFE"), Bill E. Gibson, and Holli R. Gibson, on the other hand (the "Settlement Agreement").

The De-Identification Checklist should be completed and returned to Salsarita's at the address set forth below within twenty-one (21) days of the Effective Date of the Settlement Agreement.

Date of Complete De-Identification: _____

Please complete the following requirements for de-identification of your former
Salsarita's Fresh Cantina store
Upon completion, send completed Checklist and materials to:

*Salsarita's Franchising, LLC.*
*Attn: Franchise Administration*
*4601 Charlotte Park Drive*
*Suite 250*
*Charlotte NC 28217*

Questions? Please contact your Salsarita's Franchise Business Consultant

<u>INSTRUCTIONS</u>:    Please indicate if the item or action below has been completed by initialing in the boxes provided.

| Cessation of Use of the Marks | |
|---|---|
| | Immediately discontinue the use of the trade name and trade marks bearing "Salsarita's®"(typed), "Salsarita's (Stylized), or "Salsarita's Fresh Cantina®" and all other trade names and trademarks owned by Salsarita's Inc. or its affiliates (collectively, the "Marks") or any name or mark deceptively similar thereto. |

| Exterior | |
|---|---|
| | Prompt action to change the color scheme, both exterior and interior, of the building and other improvements situated on the restaurant premises, so that the color scheme shall not create any impression in the mind of the public that any operation being conducted in, on or |

16

| | |
|---|---|
| | from the premises is or was in any way connected with any of the Trademarks. Special attention should be made to the following: |
| | Signage color – as the Trademark signage is removed, any new signage should not be of the same color and/or letter styling. |
| | Remove parking signage. |
| | Remove enter/exit signage if such signage features Trademarks. |
| | Enter / exit signage if such signage features the Marks |
| | Off-site advertising, such as billboards, posters, etc. |
| **Vehicle** | |
| | Promptly remove all graphics and stripes on any vehicles bearing the Marks or other proprietary materials used to previously identify the vehicle with Salsarita's. |

| | |
|---|---|
| **Interior** | |
| | Prompt action to change the color scheme and decor within the building and other improvements situated on the restaurant premises, so that the color scheme and décor shall not create any impression in the mind of the public that any operation being conducted in, on or from the premises is or was in any way connected with any of the Trademarks. Special attention should be made to the following: |
| | Repaint or modify interior paint colors so as render distinctly different |
| | Removal of wall mural |
| | Removal or repainting of sunburst millwork so as to render it unrecognizable as being connected with any of the trademarks or trade dress |
| | Removal or permanent covering of Marks on concrete stanchions |
| | Removal or modification of exposed rebar on concrete stanchions |
| | Removal of "Quick Cantina" wall fixture and cabinetry (if applicable) |
| | |
| | Promptly remove all signs, displays, cards, notices, decals, or other printed materials on which any of the Marks or any deceptively similar name or mark appears. Special attention should be given to the following items that normally carry the Marks: |
| | |
| | General interior including window clings, bulletin boards, banners, posters, signs, etc |
| | Credit Card Imprinter |
| | Liquor License |
| | Health Certificate |
| | Sales Tax Certificates |
| | State, County, or local permits |
| | Cups, napkins, barware bearing the marks |
| | Menus – Food Menu, Bar Menu, Catering Menu, etc. |
| | Dining Room & Bar |

17

83

|  | Operating hours signage |
|--|--|
|  | Any proprietary food or bar items |
|  | Gift Certificates/gift cards |
|  | Specials & Promotion Signage |
|  | All point of purchase (P.O.P.) materials |
|  | Entry mat |
|  | Catering Displays |
|  | Uniforms / name badges |
|  | Business cards / comment cards |
|  | Office paper forms |
|  | Beverage Station materials (ex: tea urn wraps) |
|  | Custom-designed Main Menu Board – including "order here" and "pick-up" here signage |
|  | Theme-related décor items |
|  | Company checks |

| **Proprietary and Confidential Materials (to be returned)** | |
|--|--|
|  | Promptly return any and all operations and procedural manuals and other printed materials provided by Salsarita's Inc. or its affiliates. Special attention should be given to the following items: |
|  | Operations manuals |
|  | Pre-opening manual |
|  | Policy manuals and templates |
|  | Training manual |
|  | Recipe Cards |
|  | Training videos or printed materials |
|  | Product / price guides and manuals |
|  | Unused marketing materials |
|  | Coupons |
|  | Miscellaneous Salsarita's logo materials |

| **Telephone numbers** | |
|--|--|
|  | Contact the telephone company to change the telephone number and listing used by the Store and by Franchisee. Provide written notification to companies (and to Salsarita's) that all listings in all directories should no longer be used by Franchisee. |

| **Pictures** | |
|--|--|
|  | Once the de-identification process is complete, please take photographs of the exterior and interior of the Store. Send these photographs to Salsarita's Franchising with this Checklist and other materials to be returned. |

18

84

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT C

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

## Burnaco's ft. Maiden City Brewing, Lexington, KY - Menu





DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT D

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04



**Simply States Burrito**

**Change to Salsa Verde**

**Take Home**

Mix and Match Take It Home

*Your choice of _____ soft or hardshell tacos for $_____
*Chicken or beef (or a mixture of both) filling (feeds 4) $_____
*All the toppings (lettuce, cheese, sour cream, tomatoes) (feeds 4) $_____
*Side of Mexican Rice (feeds 4) $_____
*Side of Black Beans (feeds 4) $_____
*Side of chips and 2 salsas $_____
*Side of queso $_____
*Dessert churros (feeds 4) $_____

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT E

*[Redacted from Public Filing]*

89

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No.: 3:22-cv-206-FDW-DSC**

| | | |
|---|---|---|
| **Salsarita's Franchising, LLC**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **[PROPOSED] CONSENT** |
| | ) | **JUDGMENT AND PERMANENT** |
| **Gibson Family Enterprises, LLC**, | ) | **INJUNCTION** |
| **Bill E. Gibson**, & | ) | |
| **Holli R. Gibson**, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THIS MATTER is before the Court following the filing by the Parties on November 14, 2022 of a Joint Motion for Entry of Consent Judgment and Permanent Injunction (the "Motion"). (Dkt. 47). In the Motion, and as further set forth in the Parties' supporting joint memorandum of law (Dkt. 48), Plaintiff Salsarita's Franchising, LLC ("Salsarita's") and Defendants Gibson Family Enterprises, LLC ("GFE"), Bill E. Gibson, and Holli R. Gibson (collectively, the "Gibsons," and together with GFE, the "Defendants") consent to and move this Court for entry of a final judgment and permanent injunction. This Motion represents, and the Court finds, that the Parties have entered into a Settlement Agreement filed with the Motion to resolve this action. This Court finds that the Settlement Agreement and the exhibits thereto, which are attached to this Judgment as Appendix 1, can be made the subject of this Consent Judgment and Permanent Injunction, and the Court hereby approves, adopts, and incorporates by reference herein the terms of the Settlement Agreement and exhibits thereto, thereby making the Parties' agreement a part of this Judgment.

**FINDINGS OF FACT**

1.      On or around April 10, 2013, Salsarita's and Defendants executed a Franchise

1

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Agreement and related documents for the operation of a Salsarita's® franchised restaurant at 2380 Norman Lane, Lexington, KY 40503.

2.      Defendants Bill E. Gibson and Holli R. Gibson own an interest in and participate in the operation of two restaurants operating under the name, "Burnaco's," in Lexington, Kentucky and Paris, Kentucky, both of which sell Mexican food and beverages.

3.      The Burnaco's in Lexington, Kentucky is within three miles of Defendants' franchised Salsarita's restaurant.

4.      The Burnaco's in Paris, Kentucky is outside a three-mile radius of Defendants' franchised Salsarita's restaurant.

5.      On or around May 9, 2022, Salsarita's sent notice to Defendants that it had terminated the Franchise Agreement.

6.      Defendants disputed the validity of the termination of the Franchise Agreement and continued to operate the Lexington Salsarita's.

7.      Salsarita's alleges, and Defendants dispute, that Defendants are using Salsarita's confidential information and trade secrets to operate Burnaco's in Lexington and Paris.

8.      Defendants have also asserted counterclaims against Salsarita's for breach of the Franchise Agreement due to improper termination of the Agreement as well as claims for unfair and deceptive trade practices.

9.      Salsarita's denies the allegations made by the Defendants in connection with these claims.

10.     On November 14, 2022, the Parties entered into a Settlement Agreement to resolve all disputes among them.

11.     Pursuant to Paragraph 2 of the Settlement Agreement, the Parties agreed that the

2

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

Franchise Agreement would be terminated effective December 5, 2022.

<u>**CONCLUSIONS OF LAW**</u>

1. This Court has personal jurisdiction over all Parties pursuant to the Parties' forum selection clause.

2. This Court has subject matter jurisdiction over this dispute pursuant to principles of federal question jurisdiction and supplemental jurisdiction.

3. Salsarita's presented evidence that it argues supports its claims for breach of contract, trademark infringement, unfair competition and false advertising, misappropriation of trade secrets, and unfair and deceptive trade practices. Defendants deny Salsarita's evidence supports those claims and contend that the evidence supports their claims for breach of contract and unfair and deceptive trade practices.

4. The provisions of the Settlement Agreement represent a compromise that grants the relief awarded in this Consent Judgment and Permanent Injunction to Salsarita's.

5. Salsarita's asserts that it has an inadequate remedy at law and will suffer irreparable harm without an injunction, that the balance of the harms weighs in favor of the injunctive relief awarded in this Order, and that the public interests favor entry of this Order. While the Defendants dispute these allegations, they are agreeable to the terms of this Consent Judgment and Permanent Injunction as part of settlement of the disputes between the parties.

6. Entry of this Consent Judgment and Permanent Injunction fully and finally resolves all claims and defenses asserted in this litigation, except for any proceeding to enforce the terms of this Order and except for any claims made pursuant to Paragraph 13 of the Settlement Agreement, which will be decided outside this litigation.

7. This Consent Judgment and Permanent Injunction is binding and enforceable both as to form and scope pursuant to Federal Rule of Civil Procedure 65(d).

3

8.      The Settlement Agreement and all of its exhibits (except for Exhibit E to the Settlement Agreement, which the parties represent is a confidential document, the exclusion of which does not affect the enforceability of this Order) are attached as Appendix 1 to this Order and are made part of this Order. All capitalized terms not otherwise defined in this Order shall have the meaning given to those terms in the Settlement Agreement.

9.      The Parties stipulate to entry of this Consent Judgment and Permanent Injunction.

10.     By stipulating to entry of this Consent Judgment and Permanent Injunction, Defendants do not admit any of the allegations set forth in the Amended Complaint, other than that this Court has personal jurisdictional and subject matter jurisdiction to enter this Order.

11.     The Parties have all waived any right to appeal this Consent Judgment and Permanent Injunction.

12.     The Parties understand the undertakings, obligations, and terms of this Consent Judgment and Permanent Injunction.

13.     The Parties acknowledge they have knowingly and voluntarily agreed to the entry of this Consent Judgment and Permanent Injunction after reviewing the same with their counsel and having had ample opportunity to consult with counsel.

**ORDER**

Accordingly, by agreement and consent of the Parties, their Joint Motion for Entry of Consent Judgment and Permanent Injunction is GRANTED. It is hereby ORDERED, ADJUDGED, and DECREED, and Defendants are PERMANENTLY ENJOINED, as follows:

14.     By December 5, 2022, Defendants must permanently cease to operate the Lexington Salsarita's and shall permanently cease to use the Salsarita's System or the Salsarita's Proprietary marks. Until that time, Defendants shall strictly comply with the requirements of the

4

Franchise Agreement. Thereafter, Defendants shall not represent themselves to the public or hold themselves out as present or former Salsarita's franchisees.

15.     By December 5, 2022, Defendants must make all necessary modifications or alterations to the premises of the Lexington Salsarita's to distinguish the appearance of the premises from that of any other Salsarita's® restaurant. Specifically, Defendants shall complete the requirements for de-identification set forth in the De-Identification Checklist attached to the Settlement Agreement as Exhibit B. Defendants must permit Salsarita's to inspect the Lexington Salsarita's premises to determine compliance with the De-Identification Checklist in accordance with the timeline set forth in Paragraph 4 of the Settlement Agreement.

16.     For the two-year period beginning November 14, 2022, and except as otherwise permitted by Paragraph 14 of this Order, Defendants shall not, by themselves or through or in conjunction with any other person or entity, own, manage, operate, maintain, advise, consult with, invest in, be employed by, or engage in any restaurant that sells Tex-Mex or Mexican food or beverages. This restriction shall apply to the following geographic areas: (a) at the Lexington Salsarita's premises; (b) within a three-mile radius from the Lexington Salsarita's premises; or (c) within a two-mile radius of any other Salsarita's franchisee currently in operation as of the Effective Date. For example, and without limitation, this restriction prohibits Defendants from providing Mexican food or beverage catering services within the restricted geographic areas, but not outside the restricted geographic areas. For another example, and without limitation, this restriction prohibits Defendants from operating a Mexican food or beverage food truck within the restricted geographic areas, but not outside the restricted geographic areas. This restriction does not prohibit Defendants from owning less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

5

17.     On or before December 5, 2022, Defendants shall cause the Lexington Burnaco's to modify its menu in accordance with Paragraph 6 of the Settlement Agreement. Defendants' obligations under this Paragraph shall expire November 14, 2024.

18.     Effective November 14, 2022, Defendants shall not publish, disclose, transfer, release, divulge, or use any of Salsarita's Confidential Information or Trade Secrets, including without limitation for the benefit of any other enterprise such as the Lexington Burnaco's or the Paris Burnaco's as provided in the parties' now terminated Franchise Agreement. This restriction does not prohibit Defendants from using Salsarita's Confidential Information and Trade Secrets for the operation of the Lexington Salsarita's through December 5, 2022, as permitted in Paragraph 14 of this Order. On or before December 5, 2022, Defendants shall return to Salsarita's and shall not retain any copies of all Confidential Information and Trade Secrets in their custody or control, whether in electronic, hard copy, or any other form.

19.     Effective November 14, 2022, Defendants shall ensure the Paris Burnaco's is not using any of Salsarita's Confidential Information or Trade Secrets. Effective December 5, 2022, Defendants shall cause the Paris Burnaco's to modify its menu and undertake the obligations set forth in Paragraph 8 of the Settlement Agreement.

20.     Effective November 14, 2022, and except as otherwise permitted by Paragraph 14 of this Order, Defendants shall permanently cease all use of the Proprietary Marks and any other marks confusingly similar thereto and shall not identify themselves or their businesses in any way that suggests a connection or associate with, or an endorsement or sponsorship by, Salsarita's. On or before December 5, 2022, Defendants shall deliver to Salsarita's all materials bearing the Proprietary Marks, whether in electronic, hard copy, or other form.

6

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

21.    Defendants must abide by all provisions of the Franchise Agreement (attached to the Settlement Agreement as Exhibit A) that, by their terms, extend beyond termination. These provisions of the Franchise Agreement, which will remain in full force and effect, include:  Section IX.A.1.; Section XI.A.; Section XI.F.; Section XII.A.; Section XII.B.; Section XII.C.; Section XVI.B. through I.; Section XVII.B.; Section XVIII.; Section XXII. (except subsections G and M).; and all applicable provisions of the Payment and Performance Guarantee.

22.    Defendants must otherwise strictly comply with the Settlement Agreement in all respects.

23.    This Consent Judgment and Permanent Injunction is binding upon Defendants, together with their respective officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with any of them who receive actual notice in any manner of this Consent Judgment and Permanent Injunction by personal service or otherwise.

24.    This Consent Judgment and Permanent Injunction coupled with the Settlement Agreement  is a full and final resolution of all claims that were asserted or that could have been asserted by the Parties in this action, including damages, except for any claims made pursuant to Paragraph 13 of the Settlement Agreement, which will be decided outside this litigation, and subject to the following provision: This Court shall retain jurisdiction to enforce the terms of this Consent Judgment and Permanent Injunction and the Settlement Agreement. Should the Court find, upon motion filed by an aggrieved party, that there has been a violation of the Consent Judgment and Permanent Injunction or Settlement Agreement, the Court is empowered to determine the appropriate remedy for said violation, including, if the Court deems appropriate, invocation of the Court's power of contempt.

7

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

25.    The Court retains jurisdiction over any motion or action to enforce this Consent Judgment and Permanent Injunction or the Settlement Agreement. Otherwise, this Consent Judgment resolves this action and is a final judgment. Each party hereto shall bear his or its own costs and attorneys' fees incurred to date.

SO ORDERED, this the ___ day of November, 2022.

_____
Hon. Frank D. Whitney
United States District Court Judge

8

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

CONSENTED TO:

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ Matthew S. DeAntonio*
Matthew S. DeAntonio (N.C. Bar No. 39625)
Samuel M. Dearstyne (N.C. Bar No. 54803)
mdeantonio@bradley.com
sdearstyne@bradley.com
214 North Tryon Street, Suite 3700
Charlotte, NC 28202/
Telephone: (704) 338-6000
Fax: (704) 332-8858
*Attorneys for Plaintiff*
*Salsarita's Franchising, LLC*

**DINSMORE & SHOHL LLP**

*/s/ Grahmn N. Morgan (with permission)*
Grahmn N. Morgan (admitted pro hac vice)
Kristeena L. Johnson (admitted pro hac vice)
100 W. Main Street, Ste. 900
Lexington, Kentucky 40507
T: (859) 425-1000
F: (859) 425-1099
Grahmn.morgan@dinsmore.com
Kristeena.johnson@dinsmore.com
*Attorneys for Defendants*

AND

**MILLBERG GORDON STEWART PLLC**

*/s/ Peter N. Borden (with permission)*
Peter N. Borden (N.C. Bar No. 53389)
1101 Haynes St., Ste. 104
Raleigh, North Carolina 27604
T: (919) 836-0090
F: (919) 836-8027
pborden@mgsattorneys.com
*Attorney for Defendants*

9

DocuSign Envelope ID: D0F09EA4-B391-4586-8507-54FBE9BB9E04

# APPENDIX 1

*[Appendix 1 to the Proposed Consent Judgment and Permanent Injunction
shall be an Executed Version of the Settlement Agreement, with Exhibit 5 thereto redacted]*

10